LAWRENCE H. SCHOENBACH, ESQ.
Law Offices of Lawrence H. Schoenbach
111 Broadway, Suite 901
New York, New York 10006

JOSHUA L. DRATEL, ESQ.
Dratel & Lewis, P.C.
29 Broadway, Suite 1412
New York, New York 10006

*Attorneys for Victor Carlström, Stephen Brune ,*
*Vinacossa Enterprises AB, SBS Resurs Direkt AB,*
*Boflexibilitet Sverige AB, Vinacossa*
*Enterprises Ltd, and Sparflex AB*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

|  |  |  |
|---|---|---|
| VICTOR CARLSTRÖM, STEPHEN BRUNE, | ) | **VERIFIED COMPLAINT** |
| VINACOSSA ENTERPRISES AB, | ) | **AND JURY DEMAND** |
| VINACOSSA ENTERPRISES LTD, | ) | RICO (18 U.S.C.§1962(c)) |
| BOFLEXIBILITET SVERIGE AB, SBS | ) | RICO CONSPIRACY |
| RESURS DIREKT AB and SPARFLEX AB. | ) | (18 U.S.C.§1962(d)) |
|  | ) | COMPUTER FRAUD AND |
| Plaintiffs, | ) | ABUSE ACT |
|  | ) | (18 U.S.C.§1030(a)) |
| -   Against – | ) | BREACH OF CONTRACT |
|  | ) | (NEW YORK COMMON LAW) |
|  | ) | TORTIOUS INTERFERENCE |
| FOLKSAM ÖMSESIDIG LIVFÖRSÄKRING, | ) | WITH CONTRACT |
| SWEDBANK AB, SKATTEVERKET, | ) | (NEW YORK COMMON LAW) |
| FINANSINSPEKTIONEN, JENS | ) | TORTIOUS INTERFERENCE |
| HENRIKSSON, ERIK THEDÉEN, KATRIN | ) | WITH COMPETITIVE |
| WESTLING PALM and others known and | ) | ADVANTAGE (NEW YORK |
| unknown. | ) | COMMON LAW) |
|  | ) | INTENTIONAL INFLICTION OF |
| Defendants. | ) | EMOTIONAL DISTRESS |
|  | ) | (NEW YORK COMMON LAW) |

_____)


Plaintiffs VICTOR CARLSTRÖM, STEPHEN BRUNE, BO FLEXIBILITET SVERIGE

AB, VINACOSSA ENTERPRISES AB, VINACOSSA ENTERPRISES LTD, SBS RESURS

DIREKT AB and SPARFLEX AB, allege the following against defendants FOLKSAM ÖMSESIDIG LIVFÖRSÄKRING ("Folksam"), SWEDBANK AB, SKATTEVERKET, FINANSINSPEKTIONEN, JENS HENRIKSSON, ERIK THEDÉEN, KATRIN WESTLING PALM and others known and unknown.

## JURISDICTION

### *Subject Matter Jurisdiction*

1.      This Court has federal question jurisdiction pursuant to 28 U.S.C. §1331 because this action arises under 18 U.S.C. §§1961-68 (Racketeer Influenced and Corrupt Organizations Act) ("RICO"), and 18 U.S.C. §1030(g) (the Computer Fraud and Abuse Act). This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367(b).

### *Personal Jurisdiction*

2.      This Court has personal jurisdiction over the Defendants because they have committed multiple acts of fraud by computer and wire, and by use of the United States mail, including in, to and/or from the Southern District of New York. In addition, defendants have knowingly and intentionally used banks in the Southern District of New York and elsewhere to facilitate money laundering in violation of 18 U.S.C. §§1956 & 1957.

3.      As a result of Defendants' wrongful conduct as alleged herein, Plaintiffs have lost at least Four Billion Two Hundred Seventy-Nine Million, Eight Hundred Thousand dollars ($4,279,800,000.00 USD) dollars, clearly an amount in excess of the $75,000.00 USD jurisdictional requirement.

### *Venue*

4.      Venue is proper in the United States District Court for the Southern District of New York, pursuant to 18 U.S.C. § 1965(a)(1), because:

    a.  Plaintiff STEPHEN BRUNE is a citizen of the United States and, during the relevant time periods in this complaint, was a resident of New York City with offices in New York County (Manhattan); and

    b.  Defendant FOLKSAM ÖMSESIDIG LIVFÖRSÄKRING did substantial business in New York County:

        1.  By investing plaintiff's (and others') funds in investment vehicles in banks and other financial institutions in Manhattan, including SWEDBANK AB ("Swedbank"); and

    c.  Because Swedbank maintained offices and did business in New York County. Swedbank is registered to do business in the State of New York.

    d.  Plaintiff Victor Carlström resided in the Southern District of New York during a period of time in which defendants' tortious acts were committed.

    e.  Either Defendants and/or their co-conspirators committed predicate acts of racketeering within the Southern District of New York.

5.    Venue is also proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in the Southern District of New York. In addition, venue is proper pursuant to 18 U.S.C. §1956(i)(1)-(3).

## THE PARTIES

6.    Plaintiff VICTOR CARLSTRÖM ("Carlström"), an individual, is a citizen of Sweden; Mr. Carlström is currently residing in the United States and is seeking political asylum in the United States as a result of the facts of this case as identified within.

7.    Plaintiff STEPHEN BRUNE ("Brune"), an individual, is a citizen of the United States and a resident of New York City. At all times relevant to the allegations in this Complaint STEPHEN BRUNE resided in New York City and operated his business from his office in New York County (Manhattan).

8.      Plaintiff VINACOSSA ENTERPRISES, AB ("Vinacossa") is a company duly formed and domiciled in Gothenburg, Sweden. Vinacossa had a designated office located in Gothenburg, Sweden. Vinacossa did business in New York (Manhattan).

9.      Plaintiff VINACOSSA ENTERPRISES, LTD ("Vinacossa Ltd") is a company duly formed and domiciled in Nicosia, Cyprus. Vinacossa Ltd has designated office located in Nicosia and Larnaca, Cyprus. Vinacossa Ltd did business in New York (Manhattan).

10.     Plaintiff SBS RESURS DIREKT, AB ("Resurs Direkt") is a company duly formed and domiciled in Gothenburg, Sweden. Resurs Direkt has a designated office located in Gothenburg, Sweden. Resurs Direkt did business in New York (Manhattan).

11.     Plaintiff BO FLEXIBILITET SVERIGE, AB ("Boflex") is a company duly formed and domiciled in Gothenburg, Sweden. Boflex has a designated office located in Gothenburg, Sweden.

12.     Plaintiff SPARFLEX, AB ("Sparflex") is a company duly formed and domiciled in Gothenburg, Sweden. Sparflex had a designated office located in Gothenburg, Sweden. Sparflex did business in New York (Manhattan).

13.     Defendant FOLKSAM ÖMSESIDIG LIVFÖRSÄKRING ("Folksam") is, upon information and belief, a company duly formed and domiciled in Sweden.

14.     Defendant SWEDBANK AB ("Swedbank") is, upon information and belief, a company duly formed and domiciled in Sweden.

15.     Defendant SKATTEVERKET[1] is, upon information and belief, the Swedish equivalent of the United States' Internal Revenue Service and is a government agency of Sweden.

---

[1]  For purposes of convenience, Skatteverket will hereinafter be referred to by its English translation and cognate under U.S. law: "Swedish Tax Agency."

The Swedish Tax Agency is not entitled to sovereign immunity because the claims herein arise out of Carlström's personal injury and Plaintiffs' loss of property occurring in the United States cause by tortious acts or omissions by the Swedish Tax Agency and/or an official or employee of the Swedish Tax Agency acting within the scope of their office or employment. *See* 28 U.S.C. §1605(a)(5).

16.    Defendant FINANSINSPEKTIONEN[2] is, upon information and belief, the Swedish equivalent of the United States' Securities and Exchange Commission and is a government agency of Sweden. The Swedish Financial Supervisory Authority is not entitled to sovereign immunity because the claims herein arise out of Carlström's personal injury and Plaintiffs' loss of property occurring in the United States cause by tortious acts or omissions by the Swedish Financial Supervisory Authority and/or an official or employee of the Swedish Financial Supervisory Authority acting within the scope of their office or employment. *See* 28 U.S.C. § 1605(a)(5).

17.    JENS HENRIKSSON "), an individual, is a citizen of the Sweden and a resident of Hägersten församling, Stockholm, Sweden.

18.    Defendant ERIK THEDÉEN an individual, is a citizen of  Sweden and a resident of Hägersten församling, Stockholm, Sweden.

19.    Defendant KATRIN WESTLING PALM an individual, is a citizen of Sweden and a resident of Stockholm, Sweden.

20.    Collectively, CARLSTRÖM, BRUNE, VINACOSSA, VINACOSSA LTD, RESURS DIREKT, SPARFLEX, BOFLEX, the SWEDISH TAX AGENCY, the SWEDISH

---

[2] For purposes of convenience, Finansinspektionen will hereinafter be referred to by its English translation and cognate under U.S. law: "Swedish Financial Supervisory Authority."

FINANCIAL SUPERVISORY AUTHORITY, FOLKSAM, JENS HENRIKSSON, ERIK THEDÉEN, and KATRIN WESTLING PALM may be referred to hereafter as "the Parties."

## PRELIMINARY STATEMENT

21.     Victor Carlström is a 35-year-old citizen of Sweden who, from 2006-2015, was one of the most successful financial brokers in Sweden. As a fund manager and financial advisor, Mr. Carlström (through various companies he controlled) eventually employed more than 200 people to service more than 10,000 clients.[3]

22.     In 2013, Mr. Carlström (through his company SBS Resurs Direkt) entered into a contract with Folksam Ömsesidig Livförsäkring ("Folksam"), Sweden's largest insurance and financial services company. Folksam's clients included approximately 50% of Sweden's entire population. Carlström role was to utilize Folksam's financial services and products for the benefit of those clients. That contract would ultimately lead to the events that underlie this Complaint.

23.     Beginning in September 2015 – two years after the commencement of the contract – Jens Henriksson, then-CEO of Folksam,[4] unilaterally terminated the contract and began a concerted, malicious, and illegal effort to utilize his company, the people within his control, and other professional associates and even Swedish government entities, to destroy Victor Carlström and the companies with which he was affiliated. Over the ensuing four years, continuing through the filing of this Complaint, Henriksson has been associated in fact with a racketeering enterprise

---

[3]     Carlström (and his companies') business reputation was beyond reproach, as he developed professional relationships and business with virtually all of Europe's and the U.S.'s leading banks, including Merrill Lynch, Goldman Sachs, Société Générale, BNP Paribas, Commerzbank, UBS, HSBC, Barclays, Royal Bank of Scotland, EFG Bank, Nordea, SEB, Handelsbanken, Swedbank, Danske Bank, SBAB, Carnegie Investment Bank, Nordnet Bank and ING Bank.

[4]     In August 2019, Jens Henriksson was named Director-General of Swedbank, Sweden's largest banking institution.

that included Folksam, Swedbank, the Swedish Tax Agency, the Swedish Pension Agency, the Swedish Financial Supervisory, and several individuals. All these individuals and Swedish government agencies joined together to crush Victor Carlström, his companies and those including Plaintiff Stephen Brune, with whom Carlström did business, both in Sweden and the United States.

24.     From 2015-2019, these Swedish government agencies utilized their authority – at the behest of Jens Henriksson – to help Henriksson steal Carlström's clients, loot Carlström's companies, malign Carlström's reputation, and ultimately destroy Carlström and his family. Defendants' efforts were in reaction to and retaliation for the due diligence Carlström performed with respect to Folksam after signing the 2013 contract. What Carlström found was systematic fraud, money laundering, and tax evasion, as well as a massive kick-back scheme involving many of the named Defendants herein.

25.     In an effort to silence Carlström, Henriksson enlisted (1) a "team of 15" people at Folksam to defame Carlström and steal Carlström's remaining clients; (2) the Swedish Tax Agency to initiate completely illegitimate, unwarranted, and unjustified tax investigations against Carlström and his companies that continue to this day; (3) the Swedish Financial Supervisory Authority, to deny improperly and without authority the registration of a Carlström company, Boflexibilitet Sverige AB ("Boflex"),  through which Carlström and Brune intended to issue home mortgages in Sweden and, thereafter, in the United States; (4) to cancel a lucrative contract, potentially worth billions of U.S. dollars, that Carlström and his companies had with Swedbank; and (5) several powerful individuals in Sweden, including but not limited to Katrin Westling Palm, the Director-General of the Swedish Tax Authority, and Erik Thedéen, the Director-General of Financial Supervisory Authority, to advance and implement various elements of Henriksson's scheme.

26.     Not content with simply smearing Carlström's reputation and stealing his clients and business, the racketeering enterprise organized and managed by Henriksson went to extreme, if not extraordinary, lengths to ensure that Carlström could never reveal the information he uncovered regarding Sweden's financial system and its most important power brokers and government entities. Forced in 2019 to flee Sweden with his family, Carlström first moved to the United Arab Emirates and then, in 2019, to the United States. Once in the United States, Carlström petitioned for asylum, seeking refuge from those wishing to do harm to not only his reputation and business, but to him physically. Assassins attempted to take his life and that of his wife and two young children in Dubai, and then in New York and later Los Angeles. Currently, Victor Carlström resides in the United States, moving his domicile constantly, and under the protection of private security guards while he awaits a decision on his asylum application. In this Complaint, Carlström also seeks redress through the legal system.

## ALLEGATIONS OF FACT

### Summary of the Case

27.     At all times relevant to this complaint Carlström was a licensed financial broker in Sweden, utilizing his financial management skills through his companies Vinacossa, Resurs Direkt, and Sparflex to manage more than $150,000,000.00 (USD) of his clients' funds in New York, and more elsewhere.

28.     In June 2013, Carlström, on behalf of Resurs Direkt, entered into a contract with Folksam to become Folksam's second full-scale agent in Sweden. As a result, Resurs Direkt operated under Folksam's financial licenses. Folksam retained responsibility for all financial advice to the clients of Resurs Direkt.

29.     By the terms of the contract Resurs Direkt agreed to invest its clients' funds under Folksam's license and maintain the funds with Folksam.

30.     Shortly thereafter, in or about late 2013 and early 2014, Carlström invested through Folksam more than $150,000,000.00 USD of Resurs Direkt's clients' funds in BlackRock BGF High Yield Bond A2 USD. The BlackRock fund invested all the funds through its New York accounts in the United States.

31.     Specifically, at Carlström's insistence, Folksam invested Resurs Direkt's clients' funds in BlackRock's BGF High Yield Bond Fund A2 USD. Half of the funds were invested in U.S. corporate bonds; the balance of the funds was invested in United States Treasury bonds through BlackRock's BGF High Yield Bond investment vehicle. The terms of the investment and contract provided that Resurs Direkt and Carlström's commissions and management frees would be paid from BlackRock to Folksam, which would then transfer the payment to Resurs Direkt and Carlström. The contract also provided that Resurs Direkt would have auditing privileges with respect to the payments it would be owed from BlackRock through Folksam for Resurs Direkt and Carlström's commissions and management fees.

32.     At the time of the contract, Folksam enjoyed a reputation as an international insurance and financial services company in Sweden and around the world. Approximately half of Sweden's population are clients of Folksam. It was because of this reputation, as well as representations made by Folksam) that Carlström agreed to have Folksam manage Carlström's client's funds, which would be invested in mutual funds located in New York.

***Victor Carlström's and Resurs Direkt's Agreement With Folksam***

33.     In June 2013, Resurs Direkt entered into a formal agreement with Folksam to become Folksam's second full-scale affiliated agent in Sweden. That formal "affiliation" enabled

Resurs Direkt to work directly under Folksam, and authorized Resurs Direkt to use Folksam's financial licenses (with Folksam retaining the right and obligation of all financial advice to its clients). Resurs Direkt was one of only two affiliated agents of Folksam at the time. The agreement was signed by Åse Ödeving for Folksam, and by Victor Carlström for Resurs Direkt AB.

34.     In 2013 and 2014, Resurs Direkt, following its agreement with Folksam and with the consent of each client, invested (through Folksam and on Folksam's securities trading license) some of its funds under management, totaling approximately $150 million USD for more than 1,000 clients, in the BlackRock Fund Company's BGF High Yield Bond Fund A2 USD in NewYork. Half the investment was in invested in U.S. corporate bonds, and the other half in U.S. Treasury bonds. The Funds were maintained at the Bank of New York Mellon in Manhattan. Carlström also had his clients invested in other Folksam funds.

35.     The commission due to Resurs Direkt from its investment in BlackRock's BGF High Yield Bond Fund A2 USD – from September 2015 alone – totaled approximately $12 million USD. In material breach of the terms of the contract, Folksam never paid this commission to Resurs Direkt.

36.     In 2014 Resurs Direkt was the largest source of client investment funds into Folksam on monthly basis. At that time Carlström had four offices in Sweden. However, Folksam instructed Carlström to decrease Resurs Direkt's investment of funds into Folksam. That instruction from Folksam gave Carlström pause about Folksam's operations, and its relationship with Carlström and his companies.

37.     During the course of the investment contracts between Carlström's companies and Folksam, and while Resurs Direkt's clients' funds were invested in BlackRock, as well as other Folksam funds, Carlström began to examine Folksam and its operations more carefully. Through

that investigation, Carlström came to learn certain facts about Folksam that demonstrated substantial criminal conduct by Folksam and the other defendants.

38.     In order to protect his clients' investment with Folksam, Carlström conducted extensive and continuing due diligence of Folksam. As a consequence of that due diligence, Carlström learned very troubling facts about Folksam, and ultimately, the other Defendants as well.

***Folksam's Scheme to Capture Pension Accounts Through Indecap***

39.     February 1, 2011 Indecap AB ("Indecap") agreed to purchase Folksam Spar AB ("Folksam Spar") for 48,816,000 SEK (which converts to approximately $5.2 million USD in current values).[5]

40.     Mats Lagerqvist was, at the time, appointed as CEO of Indecap. From 2004-2009 Lagerqvist was CEO of Swedbank Robur.

41.     On November 30, 2011 Indecap completed the merger with Folksam Spar. The agreement was signed by Åse Ödeving, the CEO of Indecap *and* Folksam Spar.

42.     At the time of the transaction's completion, Indecap's 2011 revenue was reported to be $6.4 million USD, of which it reported a profit of $374,000 USD. Indecap's equity was reported by the company to be $1.9 million USD. At the same time Folksam Spar reported a 2011 profit of $256 thousand USD with $620,000 USD in equity.[6]

---

[5]  SEK refers to Swedish Krona. Hereinafter, all Swedish Krona values will be noted in United States Dollars only.

[6]  Indecap had previously lost 300 million SEK in an investment with fraudulent investment advisor Bernard Madoff. *See* Love Strandberg, "Madoff fraud still a 'backpack' for Indecap," *SVP Nringsliv*, available at https://www.svd.se/madoffsvindel-fortfarande-en-ryggsack-for-indecap.

43.     In fact, Indecap used Folksam Spar's own money to purchase Folksam Spar. Upon information and belief, the Indecap-Folksam Spar purchase was fraudulent, and violated Swedish law, which prohibits the type of funding structure utilized for the purchase. Following the transaction, Folksam Spar merged into Indecap AB and Folksam became a 20 percent owner of Indecap AB.

44.     In November 2011 (when the agreement was completed), Folksam Spar had $139 million USD under management. Indecap had $747 million USD under management. These amounts represented a $30 million USD *decrease* in 2011 from the year prior.

45.     Following the Indecap-Folksam Spar transaction, the "new" Indecap company engaged in a criminal kickback scheme by using client funds to bribe officials at Folksam, Swedbank, and the Pensionmyndigheten (the Swedish Pension Agency).[7]

46.     As a part of the kickback scheme Folksam, Swedbank, and the Swedish Pension Agency laundered the proceeds of that kickback scheme by creating off-shore shell companies to conceal the proceeds of the scheme by, among other things, using client funds to purchase real estate and other things of value.

47.     Mr. Carlström's review of Indecap's financial records showed that in 2012 Indecap increased its managed capital from $747 million USD to $1 billion USD. At the same time Indecap's commission revenues nearly doubled – from $6.4 million USD in 2011 to $12 million USD in 2012. At the time of the increase in "commissions" Indecap had virtually no employees, yet reported a total of approximately $747,000 USD in salaries.

48.     Indecap maintained its corporate banking accounts at Swedbank.

---

[7] For purposes of convenience, Pensionsmyndigheten will hereinafter be referred to as the "Swedish Pension Agency."

49.     The vast majority of Indecap's newly-acquired managed capital, consisting of approximately 5,000 new customers annually, came from the Swedish Pension Authority, a government entity headed by Katrin Westling Palm and, to a lesser extent, Folksam.

50.     The transfer to Indecap of the 5,000 Pension System and/or Folksam accounts annually was accomplished contrary to Swedish law because the accounts were steered to Folksam and Indecap without the required competitive bidding in a public process, and because the transfers were accomplished:

    a.   without the client's express permission or authority;

    b.   without ever advising the client of the transfer; and

    c.   without providing to the client documentation or advice concerning the risks attendant to the client's funds being transferred to a new entity.

51.     Indecap's 2012 annual report shows the payment of tax deductible "commissions" totaling $8 million USD. The vast majority of those "commissions" paid in 2012 derived from the 5,000 new customers annually that the Swedish Pension Authority transferred to Indecap. Yet under Swedish law, at no time – ever – is a commission allowed to be paid to an individual in a government position. Because the 5,000 new accounts annually came directly from the Swedish Pension Authority no "commissions" could be legally generated or earned. Therefore, such commissions constituted a crime.

52.     In fact, the $8 million USD was the corpus of an illegal kickback scheme disguised as payment to a non-existent financial broker(s).

53.     Indecap stole the pension savings of the Swedish people (and Folksam's clients' funds) and utilized them to pay so-called "commission costs." In fact, those funds were improperly diverted to Jens Henriksson, Stefan Holm, Katrin Westling Palm, Daniel Barr, and others.

54. On April 17, 2012, Stefan Holm ("Holm") was appointed to Indecap's Board of Directors. Notably, Holm had previously served as Chairman of Folksam Spar.

55. On January 16, 2014, Holm was appointed as CEO of Folksam Fondförsäkring AB (Folksam's Funding Company), the company responsible for the distribution of significant assets to Indecap.

56. A review of Indecap's 2013 financial records revealed that, as was the case in 2012, Indecap increased its managed capital from $1 billion USD to $1.3 billion USD. This capital growth derived almost entirely from 9,200 *additional* accounts illegally transferred from the Swedish Pension Agency. As in 2012, the Director General of the Swedish Pension Agency was Katrin Westling Palm. As Director-General, Ms. Palm was responsible for the distribution of client funds to Indecap.

57. During that time period, Indecap's commission revenues increased substantially again -- from $12 million USD to $19 million USD. As in 2012, at the time of the increase in 2013 "commissions," Indecap had virtually no employees and reported a total of approximately $747,000 USD in salaries.

58. Throughout the period discussed above, Swedish law remained unchanged: it would be a crime to pay a commission at any time to a government entity or individual in a government position. Folksam's 9,200 new accounts came directly from the Swedish Pension Authority. As a result, no legal "commission" could be generated or earned. In contrast to the mischaracterization that they constituted "commissions," the $14.9 million USD reported by Indecap as "commission fees" was the corpus of the illegal kickback scheme disguised as payment to a non-existent financial broker(s).

59.     In 2013, Stefan Holm joined the Board of Directors of Indecap and became one of its senior executives. At the same time Holm was the head of Folksam Fonder's management committee responsible for executing Folksam's contracts with outside finance companies. Henriksson and Holm have been good friends for 30 years and studied at the university in Lund, Sweden.

60.     On January 16, 2014, Jens Henriksson, as CEO of Folksam Ömsesidig Livförsäkring, appointed Stefan Holm as CEO of Folksam Fondförsäkring. Holm assumed the role from Åse Ödeving.

61.     Jens Henriksson who, in addition to being CEO of Folksam's parent company at the time, is Chairman of Folksam Fondförsäkring's Board of Directors. Together with Stefan Holm, who was then the new CEO of Folksam Fondförsäkring, Henriksson controlled Folksam Fondförsäkring and its $10.7 billion USD under management.

62.     Although named as Folksam Fondförsäkring's CEO, Stefan Holm maintained control of Indecap – through which Henriksson and Holm distributed Folksam Fondförsäkring's client's assets from Folksam Fondförsäkring to Indecap.

63.     Indecap's 2014 Annual Report showed that the company obtained 6,082 new clients from the Swedish Pension Authority. It also obtained approximately 1,500 other new clients, the majority of which came from Folksam's Individual Pension Savings accounts ("IPS").

64.     In 2014, Indecap reported employee salaries of $1.19 million USD of which the "leading employees" (*i.e.*, CEO and officers) were paid $235,000 USD. it is not known to whom these salaries were paid. Indecap identified its company's officers only as Indecap employees.

65.     Indecap's structure could not have accommodated the dramatic annual increase in customer accounts. In order to do so legitimately, Indecap, as a financial services company, would

have required many more employees to support such an increase in clients. That necessity was compounded by Indecap's client increases in prior years of more than 14,000 new clients

66.     Also, Swedish financial law required each new client to consent to the transfer of their account and to complete a thorough vetting by Indecap of the client's financial status. Yet that did not occur – in large part because Indecap had virtually no employees, and certainly not enough to conduct that requisite process.

67.     Jens Henriksson, Daniel Barr, Erik Thedéen, and Katrin Westling Palm, have been lifelong professional and personal friends. They utilized those relationships (and Swedish Pension Agencyy assets) to grow Indecap by 23 percent – from $1.3billion to $1.6 billion USD – in 2014 alone. Indecap reported the payment of $16.9 million USD in "commissions" (on $22.8 million USD in revenue), notwithstanding that Indecap still had but a handful of employees who could not have handled in legitimate fashion the required level of services for its purported client base.

68.     Indecap's annual reports state that in 2015, Indecap's commissions increased to $27.4 million USD, with $20.9 million USD paid out in commissions. As in previous years, it had virtually no employees. Similarly, in 2016, Indecap's commissions increased to $31.7 million USD, with $24.9 million USD paid in commissions – again, with only a handful of employees. Likewise, in 2017, Indecap's commissions increased to $33.3 million USD, with $28.7 million USD paid out in commissions, still with virtually no employees.

69.     In 2018, Indecap's revenues increased again – to $41.6 million USD, paying out $33.3 million USD as "commissions." As in previous years, it had virtually no employees. It reported salary expenses of approximately $290,000 USD for all company employees, of which approximately $90,000 USD was paid to the officers of the company.

70.     By early 2015, the relationship between Carlström and Folksam had deteriorated, in large part because Carlström had voiced to Folksam  the concerns he harbored about Folksam's ongoing operations.  As a consequence, Henriksson and Folksam began a years-long effort, continuing to this day, to destroy Carlström, his businesses, and his family, by, in part, decreasing Carlström's number of clients and the volume of his clients' assets.

71.     In furtherance of these malign efforts, Henriksson and the other defendants utilized Folksam, the Swedish Tax Agency, the Swedish Financial Supervisory Authority and others, known and unknown, to crush Carlström, turning Folksam and the other entities and individuals into a racketeering enterprise to accomplish their nefarious goals.

***Folksam Breaches Its Agreement with Carlström and His Companies***

72.     In or about September 2015, Folksam breached its contract with Carlström's company (Resurs Direkt), and refused to pay Carlström and his company more than $12,000,000.00 USD in fully earned commissions that were due Carlström's company.

73.     Following Folksam's breach of its contract with Resurs Direkt, Folksam embarked on a concerted campaign to steal Carlström's clients and illegally move those client accounts to other Folksam funds from which Folksam reaped a greater profit. Many of those clients' fund accounts were moved to Folksam funds without each client's knowledge or consent.

74.     Thereafter, as more fully described below, there began a series of events, continuing to this day, to destroy Carlström, his family, and his companies, and eliminate any possibility for him to pursue any livelihoos in Sweden and Europe.

75.     These series of events have included contrived, unwarranted, and otherwise malicious government-led investigations of Carlström and his companies, first by the Swedish Financial Supervisory Authority, and thereafter by the Swedish Tax Agency.

76.     These series of Swedish government investigations, including tax and securities investigations, while entirely groundless both legally and factually, have been rooted in the corrupt relationship between defendants, and have since their inception engulfed and preoccupied Carlström and his companies.

***Carlström Continues His Due Diligence Regarding Folksam's Operations***

77.     As a consequence of Carlström learning of the financial fraud involving Folksam, the Swedish Tax Agency, the Swedish Financial Supervisory Authority, the Swedish Pension Authority, Swedbank, Jens Henriksson, Erik Thedéen and Katrin Westling Palm and others, Carlström continued to conduct his due diligence.

78.     In the course of those efforts, Carlström learned more troubling information about the corrupt relationship between defendants.

79.     For example, from 1994 through 2006 Henriksson was working in the Swedish Ministry of Finance. Daniel Barr and Erik Thedéen were also working in the Ministry. Previously, Barr and Henriksson had worked together for four years in Sweden's finance ministries. They have been friends for nearly a quarter of a century.

80.     In 2008, Henriksson was appointed the Executive Director of the International Monetary Fund ("IMF"). In 2008 and 2009, Henriksson represented the Baltic Constituency, which included Estonia, Lithuania, and Latvia.

81.     In 2009, as Executive Director of the IMF, Henriksson approved a loan to Latvia of $2.35 billion USD.

82.     In 2010, Swedbank AB ("Swedbank") appointed Henriksson as head of its banking relations for large corporations and institutions in the Baltic States. In that position, Henriksson possessed overall responsibility for Swedbank's relationship with other banks in the region.

83.     Also in 2010, Henriksson worked at Nasdaq OMX (Swedish Stock Market) under Erik Thedéen who was, at the time, General Director of Nasdaq OMX.

84.     At the end of 2010, Henriksson replaced Thedéen as General Director of Nasdaq OMX. That same year Henriksson was appointed the head of Nordic fixed income & Baltic Markets for Nasdaq OMX.

85.     At or about the same time period, Katrin Westling Palm was appointed the Director-General of the Swedish Pension Authority.

***Jens Henriksson Consolidates His Control Over Folksam and the Swedish Financial System***

86.     On January 16, 2013, the Director General for Folksam, Anders Sundström, resigned his position at Folksam following his appointment as the new Chairman of the Board of Directors at Swedbank. Jens Henriksson then assumed the Director-General position at Folksam.

87.     On January 16, 2015, Jens Henriksson consolidated his control over Folksam by "cleaning house" at the company, and hiring eleven new management employees. All of these new hires reported directly to Henriksson,. On March 3, 2014, Henriksson hired his former colleague, Daniel Barr, as Folksam's new chief for Solvency II ("Solvens 2"), which was a new a European Union directive that codified EU insurance regulations. Essentially, Solvency II regulates the amount of capital that EU insurance companies must maintain to reduce the risk of insolvency. Two years later, on October 17, 2016, Barr was appointed Folksam's Chief Financial Officer.

88.     On March 11, 2015, Jens Henriksson appointed his long-time friend and colleague Erik Thedéen as Director-General of Folksam subsidiary KPA Pension, an entity with approximately $14.9 billion USD under management. Thedéen was approved by the Swedish Financial Supervisory Authority, and assumed office April 13, 2015. At the same time, Henriksson appointed Thedéen to a senior management position at Folksam.

89.     Only six months later, in October 2015, Thedéen became Director-General of the Swedish Financial Supervisory Authority.

90.     On or about September 16, 2015, Folksam unilaterally cancelled its contract with Resurs Direkt and refused to pay the $12 million USD fully earned and rightfully due to Resurs Direkt as brokerage commissions.

91.     Within days of Folksam's unilateral termination of the Resurs Direkt contract Folksam began moving those clients' funds, without their knowledge or consent, to Folksam's other fund management accounts.

92.     In September 2015, following Folksam's unwarranted and unjustified breach of the contract with Resurs Direkt (by unilaterally terminating it), Carlström commenced negotiations with another financial services company, Nord Fondkommission AB ("Nord"), seeking to move SBS Resurs Direkt's clients and their funds to under Nord management.

93.     Immediately following the cancellation of its contract, and for the next three months therefter, Resurs Direkt's 20 employees worked feverishly to meet for at least two hours with each of Resur Direkct's clients (as face-to-face meetings are recommended by Swedish financial authorities) to discuss with each individual client the issues that had arisen as a result of Folksam's breach, and whether the client wished to remain with Folksam or return to Resurs Direkt.

94.     All clients were advised carefully of the issues involving Folksam, including the fees and risks involved, and were asked whether they wished to return to Resurs Direkt and invest in the financial products offered by Nord.

95.     The clients were specifically advised (orally and in writing) that switching accounts from Folksam to Nord would save approximately 13% in costs over a five-year period and significantly reduce the risk associated with the client's investment. Approximately, 90% of

Resurs Direkt's clients elected to end their entire commitment to Folksam, and switch to the investment product(s) offered by Nord.

96.     Each of Resurs Direkct's approximately 1,000 clients who had switched from Folksam to Nord were provided with 18 pages of documentation regarding the transfer, and each client signed all of the forms, required by Swedish law, that established that they understood the fees and risks involved with Nord's investment product(s), and the difference between Nord'sproduct(s) and those offered by Folksam.

97.     Shortly after negotiations began between Carlström and Nord, Magnus Björkman, Folksam's Vice-CEO, threatened Nord's owner, Staffan Becket, who had from 2011-12 been the chief of the Swedish Financial Supervisory Authority (where he had worked with Anna Cederberg) that if Nord did business with Resurs Direkt, Björkman would ensure that the Swedish Financial Supervisory Authority would commence an investigation of both Nord and Resurs Direkt.

98.     On November 7, 2015, notwithstanding the threats from Folksam, Resurs Direkt signed a contract with Nord to transfer Resurs Direkt's clients' funds from Folksam to Nord.

99.     Two days later, on November 9, 2015, Folksam's attorneys, Hammarskiöld & Co., threatened both Nord and Resurs Direkt to cease transfering  Resurs Driekt's clients from Folksam. Remarkably, Folksam's lawyers cited the very agreement between Folksam and Resurs Direkt that Folksam had previously, but without justification, declared void.

100.     In December 2015, after Folksam received Resurs Direkt's written client instructions to transfer the client's funds (following nearly three months of face-to-face interviews between Resurs Direkt and its clients), Folksam commenced a campaign to smear Resurs Direkt and Carlström.

101.    For example, in violation of Sweden's Best Execution Order, Folksam contacted

all of those clients) who had chosen to move their funds from Folksam, and tried to convince them

to stay with Folksam. The "Best Execution Order," a universal principle governing the financial

services industry, requires financial services professionals and entities to execute transactions in

the manner most advantageous to their clients.  Folksam also refused to pay out to the clients their

funds.

102.    In particular, Folksam told Resurs Direkt's clients that Carlström was a fraud and

a cheat, and that he had stolen their money and would take their investments out of the country for

his personal use. As a consequence, many of Resurs Direkt's clients were angry and emotional.

Some cried, and even threatened Carlström personally.

103.    Between November 2015 and February 2016, in response to Folksam's repeated

knowingly false statements about Carlström and Resurs Direkt, Carlström and all of Resurs

Direkt's employees met again daily with each of the firm's clients attempting to reassure them of

the propriety of Resur Direkt's work (contrary to Folkstam's false allegations), and the benefits of

investing with Nord. Following those meetings, many of the clients were still unsure, and decided

to remain with Folksam. Thus, as a result of Folksam's knowingly false statements, Resurs Direkt

lost approximately 70% of its clients who had committed to switching back to Resurs Direkt,

representing approximately $10.7 million USD in lost commissions.

104.    Notwithstanding the constant lies and false accusations leveled against Carlström

and his company, from February 2016 through the summer of that year, approximately 80% of

Resurs Direkt's remaining clients had chosen to withdraw their funds with Folksam and return to

Resurs Direkt. That 80% executed documentation that was submitted to Folksam directing

Folksam to return their funds.

105.    In early February 2016, no fewer than 1,000 of Resurs Direkt's clients each executed a "Client Withdrawal Form" that was transmitted by hand to Per Knutsson, the person at Folksam responsible for receiving the executed "Client Withdrawal Form." Each delivery of the Client Withdrawal Form(s) was photographed to ensure that Folksam could not credibly deny its receipt of the executed forms.

106.    According to the Sweden's "Best Execution," law no financial company, including Folksam, has the right to refuse a customer's written instruction. Upon receipt of the client order, a company must comply within a reasonable time with that instruction, including withdrawal of an account.

107.    Yet Folksam, rather than comply with the client instruction(s), instead illegally refused to honor those client directives to transfer their accounts to Nord. As a consequence, those clients were forced to keep their accounts with Folksam. Thus, through Folksam's improper conduct, Carlström was further deprived of commissions with respect to those clients compelled to maintain their accounts at Folksam.

108.    Moreover, during the first six months of 2016 Folksam accelerated its smear campaign against Carlström and his companies. Jens Henriksson directed a group of 15 Folksam employees (the "team of 15") not to comply with the withdrawal orders. Instead, their only task was to utilize any and all means to keep the clients from withdrawing their money from Folksam. Each member of that "team of 15" violated Swedish law. The "team of 15" included:

  a.  Johan Karlsson;

  b.  Sören Lindgren;

  c.  Lena Högfelt;

  d.  Anna -Karin Laurell;

e. Carina Elm;

f. Ylva Wessén;

g. Larry Lindberg;

h. Björn Siljeholm;

i. Hamadi Saidi;

j. Lennart Molin;

k. Matz Glenhage;

l. Magnus Björkman;

m. Stefan Holm; and

n. Mikael Andersson.

109. Thus, instead of complying with Swedish law by honoring the instruction, the "team of 15" began calling all of the clients who had submitted withdrawal forms, pressing them not to take their funds from Folksam.

110. Utilizing a mantra Henriksson developed to destroy Carlström and his companies, the "team of 15" labeled Resurs Direkt generally, and Carlström specifically, as a criminal; that Carlström and his company were committing financial fraud; and that it was Carlström and his entities, not Folksam, that had stolen client money to escape abroad with the funds.

111. Folksam's "mantra" included the false claim that hundreds of complaints had been lodged against Carlström. In fact, no complaints against Carlström were ever registered at either ARN (the Consumer Agency) or SwedSec (the oversight authority over licensed brokers), Sweden's two reporting companies that receive such complaints. Indeed, to date, no complaints have ever been filed against Carlström.

112.     The organized plot to destroy Resurs Direkt and Carlström included making unannounced home visits to clients – oftentimes pretending to be police – seeking to persuade the clients to keep Folksam as its financial manager. In particular, Lennart Molin and Mikael Andersson, two members of the "team of 15," were reported to have threatened and frightened the clients. Many clients were ultimately scared into believing that unless they cancelled the withdrawal order (from Folksam to Nord), they would lose their entire life's savings.

113.     Folksam also conducted large group meetings of Resurs Direkt'sclients, at which the "team of 15" lied about Carlström and his companies and attempted to terrorize the clients into maintaining their accounts at Folksam. The unannounced home visits also continued.

114.     Folksam's conduct in refusing to comply with a client's order constituted a serious financial crime in Sweden, so serious that it should have jeopardized Folksam's license at a minimum, any company engaging in such unlawful activity would have received a substantial, if not crushing fine, and a directive to return the funds to the client immediately Indeed, while the Swedish Financial Supervisory Authority received no fewer than 100 complaints notifying it of Folksam's refusal to honor the "Best Execution Order," the Swedish Financial Supervisory Authority did not take any action against Folksam.

***The Catastrophic Effect of Defendants' Unlawful***

***Campaign Against Carlström and His Companies***

115.     Folksam's false statements had the intended effect:  they destroyed Mr. Carlström and his companies, and put Resurs Direkt out of business. They ruined Carlstöm personally, and deprived him of any opportunity to make a living in Sweden and/or Europe.

116.     In 2015, Resurs Direkt and Victor Carlström represented more than 10,000 clients as financial brokers in Sweden. As  a direct consequence of Folksam's failure to honor the "Client

Withdrawal Form," and defendants' concurrent campaign to retain Resurs Direkt's customers through fraud and falsehoods, Carlström and his companies lost approximately $10.7 million USD in commissions that would have been rightly due him and his company.

117.   Currently, Mr. Carlström has no clients, and, as the direct result of defendants' unlawful conduct, all of the companies he owned and/or operated have been put out of business.

118.   Moreover, rather than sanction Folksam for its egregious conduct, on February 4, 2016, the Swedish Financial Supervisory Authority, affirmatively and improperly assisting Folksam, made good on the prior threat by Folksam's Magnus Björkman to Nord's owner, Staffan Becket, that unless Nord ceased doing business with Resurs Direkt and Victor Carlström, Bjorkman would have the Swedish Financial Supervisory Authority investigate Nord. The Swedish Financial Supervisory Authority raided Nord's offices, seizing the company's documents, which effectively shut down Nord's operations.

119.   After six months of purportedly investigating Nord, the Swedish Financial Supervisory Authority issued a final report concluding that Nord and Resurs Direkt had not done anything wrong and that all of Nord's documentation, operations, financial advising, and business practices were proper and in good order.

120.   Despite the Swedish Financial Supervisory Authority's six-month long "investigation" and its finding that Nord, Resurs Direkt, and Victor Carlström had acted in conformity with Swedish financial laws and regulations, Defendants did not halt their unlawful attack on Carlström and any companies that dared do business with him. Anna Cederberg, then a senior executive at the Swedish Financial Supervisory Authority, contacted Nord's CEO, Charlotte Bergvall Nilsson. Ms. Cederberg told Ms. Bergvall unequivocally that unless Nord terminated its

relationship with Resurs Direkt and Victor Carlström, Ms. Cederberg would make sure a new investigation commenced.

121.     Anna Cederberg was a former colleague of Magnus Björkman, Folksam's then-Vice President. Both Ms. Cederberg and Mr. Björkman worked together at Financial Supervisory Authority in 2011.

122.     On August 8, 2016, the Swedish Financial Supervisory Authority filed a report of its investigation of Nord. The report centered almost exclusively on Resurs Direkt and its clients. The report mirrored the same groundless accusations Folksam had made previously. The Swedish Financial Supervisory Authority's report did not identify any wrongdoing by Resurs Direkt. Ultimately, the Swedish Financial Supervisory Authority terminated that investigation, too, without any finding of wrongdoing.

123.     Nonetheless, instead of closing the Nord file, the Swedish Financial Supervisory Authority referred the entire investigation to its legal department, where Anna Cederberg assumed control of the entire matter, ostensibly to review it one more time.

124.     Yet on the very day that Cederberg received the investigative file, she had a telephone conversation with Nord CEO Charlotte Bergwall Nilsson. In that conversation, Cederberg told the Nord CEO that if Nord canceled its agreement(s) with Carlström and his company, the Swedish Financial Supervisory Authority would close the entire investigation against Nord. Threatened with the promise of a third baseless investigation designed to compel Nord to abandon its commitments to Carlström and Resurs Direkt, Nord opted to cancel all of its agreements with Carlström and his company.

125.     As with Defendants' prior unlawful conduct, Carlström and his companies suffered enormous losses as a result of the pressure that forced Nord to cancel its arrangements with

Carlström and Resurs Direkt. Those losses are estimated at more than $100,000,000.00 USD in Nord's Catella Balanserad Fund alone. Those client funds instead remained under Folksam's power and authority.

***Carlström and Stephen Brune Develop a Mortgage Business for the U.S. and Sweden***

126.    On November 30, 2016, Carlström flew to New York. Shortly after arriving in New York, Carlström had a long meeting in Manhattan with Stephen Brune, a prominent New York businessman and investor. The two discussed a business concept (that had been a part of Resurs Direkt's business) involving real estate mortgages placed with SBAB Bank. Carlström and Brune decided to create (in Sweden and, later in the United States) a business that provided mortgage financing to homeowners in Sweden and the U.S.

127.    It was a concept that had been utilized by Carlström when he was working with Folksam, in which Resurs Direkt had distributed through SBAB Bank mortgages worth nearly $160 million USD. It was a part of Carlström's and Resurs Direkt's business that Folksam had destroyed.

128.    Brune was responsible for raising the initial capital that would ultimately be deposited into and then distributed by Boflexibilitet i Sverige AB ("Boflex"), a company controlled by both Carlström and Brune.

129.    Later in 2016, Mr. Brune was in preliminary negotiations to secure from several international finance companies a $1 billion USD commitment for funding the project, and was in the process of vetting those companies. The intention was that Brune would become a partner in Boflex once Swedish authorities granted the license to operate.

130.    The plan between Mr. Carlström and Mr. Brune included utilizing a newly-formed company, Sparflex AB ("Sparflex"), to obtain mortgage clients by mirroring the business plan of

SBS Resurs Direkt. The plan included the intention that Mr. Brune ultimately would become a partner in Sparflex as well.

131.    Another company, Exceed Capital AB ("Exceed"), would be the licensed financial security company that would manage the client's funds. Exceed is an independent financial services company (providing, *inter alia*, brokerage services and fund management) that had been in business for more than 20 years and had approximately 80 employees. Exceed's Board included Lena Apler, a respected financial professional and founder of Collector Bank in Sweden.

132.    According to the plan, Boflex would provide mortgages to the clients. Sparflex would utilize the licenses of Exceed Capital, just as Resurs Direkt had utilized Folksam's license. Ultimately, Boflex would replace SBAB Bank as the funding institution and distributor of the mortgages.

133.    In expectation of their ongoing business, Carlström, Brune, and Henrik Sundin, the CEO of Exceed Capital, had frequent and regular phone conferences during which their business operations were discussed.

134.    On January 19, 2017 Sparflex signed an agreement with Exceed Capital.

135.    Not even a week later, on January 25, 2017, the Swedish Financial Supervisory Authority opened an investigation of Exceed Capital. Both Charlotte Rydin, and Anna Cederberg were involved in the Swedish Financial Supervisory Authority's "investigation." Ultimately, both the Swedish Financial Supervisory Authority and Folksam urged Exceed to cancel its agreement with Carlström and Sparflex, and exerted a great deal of pressure, both directly and indirectly, to cancel the contract.

136.    For example, Folksam demanded a meeting with Henrik Sundin, Exceed Capital's CEO. At that meeting, which occurred June 13, 2017, Folksam threatened Sundin directly:  cancel

your agreement with Sparflex, or Folksam would cancel its ongoing (and very profitable) agreement with Exceed Capital that had existed for the prior 15 years. That agreement had provided Exceed's clients access to Folksam's financial services platforms and products, and a sizable monthly commission payment from Folksam to Exceed.

137.    Notwithstanding the threat, Exceed Capital notified Folksam on June 15, 2017, that Exceed would maintain its contract with Sparflex AB and Carlström. In retaliation, two days later, June 19, 2017, Folksam, again making good on its threats, cancelled its 15-year contract with Exceed Capital.

138.    Notwithstanding the threats from the Swedish Financial Supervisory Authority and Folksam, over the next four months Carlström moved most of his remaining clients from Nord to Exceed Capital.

139.    Without any issue or problem,[8] Nord and Exceed both worked to fulfill the client instructions, and the clients were satisfied that the drama Folksam had created through its unlawful conduct was absent in the relationship between Carlström and Exceed.

140.    During the summer months of 2017 and throughout the fall of 2017, Jens Henriksson's "team of 15" continued to pressure Carlström's clients to remain at Folksam. Carlström was able to persuade nearly 500 clients (representing $78.9 million USD in assets) to move their account from Folksam to Exceed. All of the documentation was completed and executed Best Execution Orders were transmitted to Folksam directing Folksam to transfer the clients' funds to Exceed.

---

[8] Despite Folksam's interference with Carlstrom's agreement with Nord, and the cancellation of the agreement between Carlstrom and Nord, some of Carlstrom's clients maintained their accounts at Nord.

141.    Repeating its previous illegal intransigence, Folksam refused to honor those orders, instead (again) using high pressure tactics, such as unannounced home visits, to keep clients from moving to Exceed. Also, Folksam's group falsely asserted that Exceed's products were worthless, and (again) that Carlström would steal all the clients' money and escape abroad.

142.    Again, Folksam's improper tactics worked. Virtually all the clients who had executed Best Execution Orders remained at Folksam, despite their desire to move their accounts. Carlström lost $8 million USD in commissions as a result of Folksam's illegal conduct.

### *Katrin Westling Palm*

143.    In October 2017, Katrin Westling Palm was appointed the Director-General of Swedish Tax Agency. One of the first directives Ms. Westling Palm issued was to order a full-scale tax investigation of Carlström and Resurs Direkt. While remarkable in and of itself, it was more so because Resurs Direkt had already been liquidated and its operations had ceased.

144.    Among Westling Palm's first few directives on the job was to commence a secret tax investigation of Vinacossa Enterprises AB, and later Vinacossa Enterprises Ltd. (a Cyprus company), two companies owned by Carlström, even though they did not do business in Sweden.

145.    On October 23, 2017 Director-General Westling Palm, while still head of the Swedish Pension Authority, changed the rules for certain of the authorized Swedish pension funds. Until then, investment of client funds in Swedish Pension funds One through Four AP funds (*i.e.*, Första - Fjärde AP fonderna) in unlisted securities and/or unliquidated assets was prohibited. The new rule allowed such investment of client funds in unlisted shares and unliquidated assets.

146.    Within weeks of Westling Palm's decision, billions of U.S. dollars were invested in the Swedish Pension Funds suddenly available for investment in unlisted securities and

unliquidated assets. One of the characteristics of those unlisted assets is that they lacked any definite or uniform value in the marketplace.

147.     In the months that followed billions of Swedish Pension fund dollars were invested in unlisted companies through off-shore accounts in tax havens such as Jersey, Guernsey, and the Cayman Islands.

148.     At the same time, Kerstin Hessius, an associate of Westling Palm for more than 30 years, and the CEO of Sweden's Third (government authorized) Fund, Tredje AP Fonden, with more than $34 billion USD under management, commenced a massive investment in unlisted shares of uncertain value. By the close of 2019's second fiscal quarter, the Tredje AP Fonden had invested more than $7.2 billion USD in unlisted shares (lacking, as noted **ante**, an identifiable value in the market). The Fund's records show a steady annual increase in value of more than 10% from 2017 until today. The Fund asserts that the increase in value in unlisted shares is the primary reason for the Fund's remarkably good performance. However, no documents or identifiable proof have ever been provided by the Fund to verify how the increase had been accomplished.

149.     Carlström's analysis of the Fund's records revealed that the Fund was a fraud, that the annual increase in value (particularly from off-shore accounts) was created artificially., The only logical conclusion that could be reached from the records and Carlström's analysis was that the Fund's existence wold be tolerated only if official corruption had been involved.

150.     When Mr. Carlström attempted to alert Swedish government officials about the Fund, the government chose not to investigate the Fund. Instead, it chose to investigate Carlström.

151.     In or about October 2017, Daniel Barr replaced Katrin Westling Palm as head of the Swedish Pension Agency, having moved there from Folksam, where he had been the head of Economics.

152.    On November 13, 2017, Swedish Financial Supervisory Authority terminated its investigation of Exceed Capital, finding no wrongdoing involving Exceed and Carlström or Carlström's companies. Exceed was, however, penalized $370,000 USD on matters unrelated to Plaintiffs. Charlotte Rydin was, at the time, the head of the legal department at the Swedish Financial Supervisory Authority.

153.    During the first six months of 2018 Folksam, through its attorneys, Hammarskiöld & Co., demanded that Carlström and Sparflex stop moving Carlström's clients from Folksam.[9] Similar demands were made to Exceed. Additionally, Folksam, using false and defamatory statements, also tried to persuade Carlström clients from taking their money from Folksam and moving it to Carlström's companies.

154.    By commencing this "invasion" of Carlström's clients, Folksam was in violation of the Swedish Financial Supervisory Authority's rule protecting clients in the industry from exactly that sort of heavy-handed attempt to deprive clients of their choice where to move their accounts and their money.

***Carlström Forms Boflexibilitet i Sverige AB***

155.    On March 1, 2018 Carlström formed a new company, Boflexibilitet i Sverige AB ("Boflex"). It was designed to be the corporate vehicle through which Carlström and Brune would issue mortgages throughout Sweden. At the time of Boflex's creation, Brune was continuing his efforts to secure more than $1 billion USD in financing with which to issue mortgages.

156.    By July 2018, Boflex's Board of Directors was complete and its application to the Swedish Financial Supervisory Authority met all criteria for obtaining a license to distribute

---

[9]    Once Folksam had cancelled its agreement with Carlstrom and his companies, he was free to remove his clients' accounts from Folksam as long as the clients provided informed consent.

mortgages in Sweden. Obtaining that license involved only a simple non-discretionary ministerial act, that the Swedish Financial Supervisory Authority failed to perform for improper reasons.

157.    On July 9, 2018, however, Carlström was notified by the Swedish Tax Agency that one year before, in October 2017 (just days after Westling Palm started as Director-General of the Swedish Tax Agency), the Swedish Tax Agency had started a secret investigation of Carlström and his Cyprus company, Vinacossa Enterprises, Ltd.

158.    The July 2018 Notice came only weeks after Carlström filed the application for Boflex's license – a time when the application should still have remained confidential within Financial Supervisory Authority. Having failed in their other methods to stop Carlström, Folksam enlisted the Swedish Tax Agency to commence yet another tax investigation, this time of Vinacossa Enterprises LTD, a company formed in Cyprus and owned by plaintiff Carlström.

159.    Swedish tax agents were assigned to conduct the investigation, and sought documents directly from the company. They also attempted to speak directly with members of the company's Board of Directors. Both acts constituted serious violations of the tax treaty between Sweden and Cyprus, as well as EU and other laws and regulations. That tax treaty requires that any alleged violation of the tax laws must be handled through the competent legal authorities in the country where the company exists -- and not through the members of the company's Board of Directors or its shareholders. In response, the entire Board of Directors of Vinacossa filed a complaint against the Swedish Tax Agency for its aggressive and illegal conduct. The Swedish Tax Authority agents committed similar violations in seeking corporate documents from Singapore.

160.    On August 24, 2018, Carlström's tax attorneys complied with all requests of the Swedish tax authorities, and submitted all bank statements regarding all transactions for Vinacossa Enterprises Ltd.

161.    By July 25, 2019, Boflex's license application was complete, and met all the Swedish Financial Supervisory Authority's guidelines and requirements. The $12,800 USD application fee was also submitted.

162.    On September 6, 2018, in a remarkable and unusually swift decision, the Swedish Financial Supervisory Authority denied Boflex's application to distribute mortgages in Sweden notwithstanding that the application had been prepared and completed by Harverst, one of the most respected financial law firms in Sweden.

163.    There were no legitimate reasons for it denial, as the application met all criteria for approval. Carlström learned that once again Anna Cederberg and Charlotte Rydin at the Swedish Financial Supervisory Authority had interceded in the licensing process to ensure denial of Carlström's and Brune's application.

164.    On September 20, 2018, Harverst filed Boflex's appeal of the Swedish Financial Supervisory Authority's decision denying the license.

165.    October 1, 2018, the Swedish Financial Supervisory Authority refused to re-examine the matter, and refused to provide an explanation for the decision.

166.    On October 19, 2019, the decision to deny Carlström's application was appealed to the Forvaltningsdomstolen. By October 19, 2018 Jens Henriksson's dear friend, Charlotte Rydin, Head of Legal at the Swedish Financial Supervisory Authority, had provided in two documents false reasons in an effort to explain why Forvaltningsdomstolen should deny Boflex's appeal.

167.   The first document claimed Boflex's application had been denied because Carlström's wife was not authorized to sign for Boflex, notwithstanding her status as an officer of the corporation. Indeed, even after Boflex's attorneys produced corporate documents verifying such authorization, Forvaltningsdomstolen persisted in its denial of the application, and on appeal – premised on the same basis – despite being provided conclusive evidence by Boflex that the rationale for denial was invalid.

168.   By November 5, 2018, Carlström submitted to the Swedish Financial Supervisory Authority a new application, and the application fee, to form the new company Boflexibilitet Sverige AB.

169.   Remarkably, on December 6, 2018, just two days after the application to form Boflex was filed, the Swedish Tax Agency commenced two new full-scale tax investigations against Carlström's companies, Sparflex AB and Vinacossa Enterprises AB.

### *Folksam Amplifies Its Attacks on Carlström*

170.   In addition, on March 23, 2018, Folksam ramped up its campaign to crush Carlström and his companies (including those in which Brune was involved), and to put them out of business before they could even start. For example, a banner across the top of Folksam's website was entitled, "Warning for False and Fraudulent Calls," and the accompanying text described Carlström's \companies, Sparflex and Boflex, as frauds. Folksam's website reached Folksam's more than four million clients, which comprises almost 50% of the Swedish population.

171.   Following the posting of that false and malicious banner headline on Folksam's website, many of Carlström's clients already in Sparflex closed their accounts and moved their funds elsewhere. It was only on April 5, 2018, when Sparflex's attorneys threatened to sue

Folksam, for, among other things, slander and defamation, did Folksam remove the article from its website. By that time, though, the damage had already been done.

***Swedbank's Involvement***

172.    Beginning in June 2018 and continuing through August 2018, Carlström met with a number of high-level bankers at Swedbank including Kasper Gefors, the head of Swedbank Private Banking. The purpose of those meetings was to negotiate a contract with Swedbank by which Swedbank would provide mortgages to Sparflex's customers through Boflex. The financing for the project would be supplied by Boflex's 1 billion USD (that Stephen Brune was working to secure).

173.    By the end of August, Swedbank's Director of Mortgage Operations, Alf Sade, advised Carlström that Malin Hlawatsch, Swedbank's Head of Partner Relations, and Kasper Gefors had discussed Boflex distributing Swedbank's mortgages throughout Sweden. All expressed a significant interest in the project. Following receipt of this information, Carlström and his attorneys expedited preparation of the required documentation so the project could be completed as quickly as possible.

174.    On September 5, 2018, Carlström was invited to Swedbank's headquarters in Stockholm to finalize the transaction between Carlström and Swedbank. Sofia Vikman, the CEO of both Sparflex and Boflex, attended the meeting along with Carlström.

175.    Less than a week later, on September 11, 2018, Boflex's attorneys contacted Anna Cederberg at Financial Supervisory Authority. The attorneys requested that denial of the application for a mortgage application be overturned, and the licensing process expedited. During the conversation the attorneys advised Ms. Cederberg that Swedbank and Boflex were in the final stages of a partnership to distribute Swedbank's mortgage throughout Sweden.

176.    Instead of expediting the process Ms. Cederberg contacted Swedbank.

177.    The very next day, September 12, 2018, following the conversation bewteen Ms. Cederberg and Carlström's attorneys, Carlström received an email from Swedbank advising that the meeting at which the Boflex-Swedbank contract was to be finalized, initially scheduled to begin in the morning and continue for a full day, would be limited to only one hour.

178.    On September 17, 2018, Carlström and Sofia Vikman flew to Stockholm for the meeting at Swedbank's headquarters. Once at the bank's offices, it was apparent the bank's officials' attitude had changed dramatically. Carlström and Vikman were kept waiting for nearly an hour. While previously Alf Sade and Malin Hlawatsch were anxious to meet Carlström and Vikman, and were always courteous and professional, at the meeting they were rude, curt, and aggressive.

179.    Hlawatsch and Sade begin the meeting by talking about fraud and, in particular, mentioned a company that was involved in fraud. It was a company that Folksam had compared to Carlström's companies. The "comparison" was a part of the "team of 15's" mantra that Carlström and his companies were frauds.

180.    Of course, the only way that Swedbank could even know about this otherwise obscure, supposedly fraudulent company (and its comparison by Folksam to Carlström) was that someone from Folksam or the Swedish Financial Supervisory Authority had communicated with Swedbank. At that point in time, the only person who knew that Carlström was negotiating with Swedbank for a contract to provide mortgages was Anna Cederberg, a senior executive at the Swedish Financial Supervisory Authority, who only a week earlier had been informed of the negotiations with Swedbank.

181.    Ultimately, the meeting was brief and to the point:  Hlawatsch and Sade advised that Swedbank wanted nothing to do with Carlström and his companies, and that the negotiations were over. Carlström and Vikman were asked to leave.

***Swedbank's Money Laundering and USA PATRIOT ACT Violations***

182.    Following Swedbank's cancellation of Carlström's mortgage transaction with Swedbank, Carlström began to examine Swedbank to determine what factors could cause Swedbank to cancel such a potentially lucrative contract at the behest of Henriksson and Folksam. Carlström learned the following facts about Swedbank.

183.    In the Spring of 2016, the New York State Department of Financial Services ("DFS"), as part of its ongoing investigation of Swedbank, had demanded that Swedbank answer whether it "had any transaction involving Mossack Fonseca […] solicited by […] the New York State chartered or licensed banking entity of your organization." Mossack Fonseca was the Panamanian law firm involved in the so-called "Panama Papers" involving a world-wide money laundering scheme.[10]

184.    Swedbank responded a month later, in a submission signed by Cecilia Hernqvist, Swedbank's Chief Compliance Officer, that it "never had any communication, transaction […] related to Mossack Fonseca." That statement was patently untrue because Mossack Fonseca maintained accounts at Swedbank for more than 100 companies and most, if not all, of the accounts were maintained at Swedbank in the Baltic States. One of these companies was linked to a notorious Russian oligarch who had transferred billions of Swedish Krona through his company's

---

[10] *See, e.g.,* https://nyti.ms/2049NTr
https://www.theguardian.com/news/2016/apr/08/mossack-fonseca-law-firm-hide-money-panama-papers

Baltic account at Swedbank. That same Russian oligarch, along with his partner, controlled over 200 companies, all with accounts at Swedbank.

185.    Of those 200 companies with accounts at Swedbank, approximately 20 of them were clients of Mossack Fonseca. In one transaction alone, the Russian oligarch transferred approximately $100 million USD from Swedbank in a Baltic State to a tax haven in the Caribbean.

186.    On March 6, 2017, less than a year after DFS served non-public subpoenas upon Swedbank for information about Swedbank's relationship, if any, with Mossack Fonseca, and only six months after Jens Henriksson was appointed to Swedbank's Nominating Committee, Henriksson caused Folksam to sell 25% of Folksam's shares in Swedbank (25.6 million shares) netting for Folksam over $600 million USD. Folksam was at the time one of the largest shareholders of Swedbank.

187.    In 2018, DFS requested additional information from Swedbank regarding any accounts related to Mossack Fonseca, and including "global" accounts at all Swedbank branches throughout the world.

188.    In response, Swedbank acknowledged that it had only "a few client accounts" associated with Mossack Foseca – and then, only accounts in Sweden and Norway. Swedbank also wrote that none of those accounts was suspected of either laundering money or bank irregularities. Again, Swedbank's response to DFS was false. Indeed, all of Swedbank's public denials have been patently false.

189.    At the time, Swedbank was of course well aware that more than 100 companies associated with Mossack Fonseca had accounts at Swedbank. Most of these accounts were located in the Baltic States and many of those accounts were owned or otherwise controlled by Russian oligarchs who had transferred billions through their Swedbank Baltic accounts. Swedbank

continued to deny – falsely – its relationship with those oligarchs, and that one of those oligarchs controlled more than 200 companies with 20 Swedbank accounts related directly to Mossack Fonseca.

190.    On September 19, 2018, an independent investigation of Baltic Danske Bank, Swedbank's competitor in Estonia, disclosed that more than $220 billion USD flowed through Danske Bank in suspicions transactions involving 6,200 clients. Swedbank was/is the largest bank in the Baltic States. The Director General of Danske Bank, Thomas Borgen, resigned same day the independent report was disclosed.[11]

191.    From information learned in 2018 via an investigative series by Uppdrag Granskning ("Mission: Investigate"),[12] a Swedish television program, investigative research was able to match Swedbank account holders to earlier known money laundering crimes in Russia and Azerbaijan. No less than 182 account holders in Swedbank were involved in money laundering crimes in Russia and Azerbaijan. The top 50 of those account holders had transferred approximately $4.5 billion U.S. dollars through Swedbank's accounts.

192.    That investigation also produced information that one of Swedbank's Baltic bank clients was a notorious Russian Oligarch who had transferred billions of Swedish Krona through his account in Swedbank to companies in Caribbean tax heavens.

193.    Moreover, the investigation revealed that 10,000 companies that sent money between Danske Bank Baltic and Swedbank Baltic over the previous years appeared to be shell or

---

[11]    *See, e.g.,* https://www.ft.com/content/519ad6ae-bcd8-11e8-94b2-17176fbf93f5 and https://www.reuters.com/article/us-danske-bank-moneylaundering-timeline/timeline-how-danske-banks-estonian-money-laundering-scandal-unfolded-idUSKCN1NO209
[12]    *See, e.g.,* https://www.svt.se/special/swedbank/kalashnikov/

otherwise non-existent companies. Many of these companies had neither a website nor any indication of an active business, and many shared the same post office box addresses.

194.    Evidence of the companies' existence as shell vehicles for international money laundering includes:

a.   many of these companies had an address of 48 Queen Anne Street, London, United Kingdom. At this one address, companies with accounts at Swedbank, received $26.5 million USD from other accounts at Swedbank.

b.   another address in London, Darkes Lane 175, showed that approximately 40 companies had address and accounts in Swedbank Baltic where approximately 30 million Euros were received in a short period of time. There were no company activities whatsoever at the address.

c.   in a single match, over 1,200 companies with accounts in Swedbank Baltic listed the same address, and many of the companies were dormant. While in "dormant" status a company is not allowed to engage in any transaction using the company's bank account. Yet, Swedbank Baltic executed large-scale transactions for those dormant companies. The transactions conducted through these companies' Swedbank accounts totaled $6.6 Billion USD.

195.    There is also evidence that Swedbank Baltic had an important role in laundering the $230 USD million that was stolen from the Russian Tax Agency in the Sergei Magnitsky case.[13] In fact, some of the most important companies to aid in laundering this stolen money maintained approximately 50 accounts at Swedbank Baltic. The companies included: Castlefront

---

[13] *See, e.g.,*
https://www.nytimes.com/2009/12/29/world/europe/29russia.html?searchResultPosition=29

LLP, Everfront Sales LLP, Bigland Corporation, Megacom Transit LTD, Unitronic LLP, Jackwell LLP, Rodney Universal LTD, Howard Resources LLP, and Jawdom Service Corp.

196.     The investigative research further discovered that Swedbank's banking client, Vega Holding Ltd ("Vega"), was linked to former Ukraine President Viktor Yanukovych. Vega maintains an account number ending with 1241 in Swedbank Lithuania. Between 2004 and 2014 there were transfers estimated at $4 million USD to Vega from five separate companies. The Uppdrag Granskning investigators concluded that the $4 million USD represents the proceeds of bribery and political corruption.

197.     Swedbank's internal confidential investigation of its Estonia Branch, confirmed that Swedbank's nonresidential high-risk clients transferred over $150 Billion USD through the Swedbank Estonia Branch alone.

198.     At the time Folksam was Swedbank's largest shareholder, and remains so today. At all times during the relevant times described in this Complaint, Folksam used Swedbank as its primary bank. All of Folksam's transactions for its more than four million clients utilized Swedbank's payment system (entitled "SUS").

***Corruption and Fraud Involving Allra and Solidar Fonder***

199.     Allra Sverige AB ("Allra") was a Swedish financial company formed in Sweden in 2008. It provided financial services to private individuals including investment of pension and investment funds.

200.     Solidar Fonder ("Solidar") is another Swedish financial company, the purpose of which was to manage its clients' investments.

201.     On February 12, 2014, Allra and Solidar formed a separate securities exchange company in Malta called DS Holdings, concealing from its clients that Allra and Solidar were the

owners. As part of the scheme, DS Holding owned 100% of DS Platforms, the entity through which DS Holding secretly operated its business.

202.    For the next several years, until Allra was forced to close its operations in 2017, and Solidar elected to close its operations (following a Swedish government investigation) in 2018, Allra and Solidar utilized DS Platforms as a shell company through which it would purchase derivative contracts and mark up the price in purchases from the shell company before selling the contracts to its clients at the inflated prices. In the process, Allra and Solidar secretly skimmed approximately 50% of the profits for themselves. Until they closed operations, both Allra and Solidar stole more than $107 million USD from the Swedish Pension Agency's clients.

203.    Corporate documents showed that DS Holdings was owned by:

    a.  37.5% -- Allra's "representatives," through their wholly owned company, Supero Holding. In trun, Allra's "representatives" are:

        1.  Alexander Ernstberger (45%); in 2017 Ernstberger was arrested by Swedish authorities and jailed. His assets were seized by the government;

        2.  David Persson (45%); in 2017 Persson was arrested by Swedish authorities and jailed. His assets were seized by the government; and

        3.  Four (4) other Allra employees whose identity is unknown.

        4.  Roland Johansson, through his wholly owned company, Sustainable Holdings. Johansson was also the owner of Solidar Fonder. He is a childhood friend of Katrin Westling Palm. To date, no charges were ever brought against Johansson. Nor were any assets seized;

      b.  25% -- Klas Hellman, a London-based financial broker, through his wholly

          owned company Roan Holding. On November 24, 2014, Klas Hellman sold his

          25% stake to Jonas Lundberg ("Lundberg").

          1.  To date, no charges have ever been brought against Hellman or

               Lundberg. Nor were any assets of either man seized;

204.    Until both companies were closed in 2017 and 2018 respectively, Allra and Solidar operated with impunity. It was only when, in 2016, Allra's representatives closed the Maltese operations and took DS Holding's clients to a newly-created separate company in Dubai, United Arab Emirates, that the Swedish government acted.

205.    Remarkably, Solidar Fonder's principal owner, Roland Johansson (along with his two brothers), went to great lengths to conceal the fact that all three were from an obscure village in northern Sweden – a village very near to the obscure northern village in which Katrin Westling Palm was raised.

206.    The three Johansson brothers were from Vännäsby, outside Umeå. Katrin Westling Palm is from a small village, Grundsunda, also just outside Umeå, Because of the proximity of these two villages to each other, the Johanssons and Palm grew up together. Incredibly, Roland Johansson, the leading figure in Solidar Fonder, is believed to have changed his birthplace from Vännäsby to an unknown village, Värners LK24, supposedly somewhere in Sweden.

207.    Following the revelations about Erik Thedéen's falsehoods, more questions began to be asked about Solidar. As a result, the Swedish Financial Supervisory Authority imposed a fine of $1 million USD against Solidar.

208.    Compared to the sanctions imposed against Allra, in which the principals were arrested, the company closed and its assets seized, the Solidar Fonder fine appeared paltry. This is

particularly true since both Solidar Fonder and Allra did the same thing:  utilize a shell company to secretly skim profits for themselves.

209.    On February 14, 2017, Katrin Westling Palm, in her capacity as Director-General of the Pension System, ordered that the Allra's funds be frozen and that no new deposits be allowed. No action was taken against Solidar's Funds.

210.    On October 10, 2017, Ekobrottsmyndigheten (the Swedish economic crime police) illegally provided to Katrin Westling Palm personally, all of Allra's correspondence and communications – including Allra's communications with its lawyers. The transfer of the documents and information violated confidentiality principles, as the SPA is not permitted to share such information with law enforcement. Yet more than three metric tons of confidential documents, including 1.1 million emails on the company's hard drive, were given to the Swedish Pension Agency, preventing Allra from ever being able to properly defend itself in the then ongoing $160 million USD case in Stockholm between Allra and the SPA.

211.    Later, on November 28, 2017, during the ongoing litigation against Allra, the same Swedish economic police again provided to the Swedish Pension Agency more than 6,000 confidential emails by and between Allra and their attorneys in Luxemburg.

212.    In 2017, the newly appointed Director General for Economic Police was Monica Rodrigo. Ms. Rodrigo is a good friend of Katrin Westling Palm. Both served together on the Board of Directors of the Swedish Pension Agency.

213.    As of December 31, 2015, Solidar had more than $210 million USD in questionable derivatives that were purchased on an approximately 50% margin.

214.    On November 13, 2018, eight days after Boflex's new application had been submitted, Charlotte Rydin resigned her position as the head of the legal department at the Swedish

Financial Supervisory Authority to begin a new job as head of the legal department of Alecta, a pension company that is one of the largest owners of Swedbank.

215.    As of November 21, 2018, the Swedish Financial Supervisory Authority had concluded an investigation of Swedbank focusing on money laundering and terrorist financing. It recommended imposing high fines and heavy penalties.

216.    However, Erik Thedéen, Director-General for Financial Supervisory Authority, with his close management team, instead chose to clear Swedbank on all charges. Ultimately, an internal investigation of how and why Swedbank was cleared of all charges was commenced. That internal investigation quickly concluded that Erik Thedéen and his team committed no wrongdoing when they cleared Swedbank.

### The Campaign Against Carlström Adds Threats to His Personal Safety

217.    The threat from Swedish authorities, along with Folksam and Swedbank, was genuine, and was increasing in intensity, if not outright dangerousness.

218.    On January 24, 2019, after receiving advice from his attorney and a private security company (who had provided private security to Carlström for the several years since Carlström's problems with Folksam began) Carlström decided that his only safe course was to flee from Sweden's corruption. He chose to arrange his escape with his family to Dubai in the United Arab Emirates.

219.    The very next day, January 25, 2019, Swedish Tax Agency investigators Katarina Hansson Brodd and Ingrid Onsjö attended a meeting called by the Swedish Tax Agency at Sparflex's head office in Gothenburg, Sweden. Among those present was Carlström's tax lawyer, Emine Lundkvist.

220.    The meeting began with the tax investigators seeking to confiscate all of the company's financial statements, company documentation, and accounting records. Lundkvist, the tax lawyer, refused.

221.    The meeting continued with Lundkvist disclosing no fewer than ten very serious and concrete pieces of evidence of systematic corruption and crimes by the Swedish Tax Agency, the Swedish Financial Supervisory Authority, Folksam, and Swedbank. The investigators were also afforded an unlimited time to review the evidence. They examined all 10 documents for approximately 30 minutes. Following their review of the evidence presented by Lundkvist, the investigators exhibited a considerable amount of stress, and became aggressive before abruptly ending the meeting.

222.    On that same day, based on all the facts known to Carlström, the decision was made that Carlström and his family needed to escape Sweden and Europe immediately. As a result, they left Sweden that night by automobile.

223.    On January 26, 2019, Carlström's family arrived in Amsterdam, and hid there for more than two weeks before it was deemed safe for it to travel to Dubai.

224.    While Carlström was in Amsterdam, his attorney, Emine Lundkvist, learned that someone had illegally entered her office. Although her office was locked and fitted with an alarm, small items had been misplaced. Because of the threatening situation facing Carlström and his family, Lundkvist decided to engage computer experts to examine her computers. The experts found suspect electronic files, and suspected that someone had copied her hard drive.

225.    By February 11, 2019, Carlström's family managed to escape safely from Europe to the United Arab Emirates ("UAE").

226.    The following day the Carlström family checked into a hotel in the UAE under an alias. Carlström set up all his computers to connect to different financial systems, including the Legal Entity Identifier System, which enables tracing of companies, including those established "off shore." That enabled Carlström to trace and identify the people involved in international money laundering and financial fraud.

227.    As part of that process, Carlström combed through thousands of documents from the prior six years, and was able to identify more than $100 billion USD traceable to one company in the former Soviet Union.

228.    On February 12, 2019, while still in Dubai, Carlström was notified by Lundkvist that the Swedish Tax Agency had reviewed all the accounting and business transactions from 2014 to December 31, 2018, involving Carlström and his companies.

229.    The Swedish Tax Agency also posed 19 very long and detailed questions about Vinacossa Enterprises AB's accounting, transaction history, and various business events, as well as an additional eight very long and specific questions regarding Sparflex's accounting and transaction records.

230.    During March and April 2019, Carlström was able to learn about even more corruption within the Swedish Tax Agency, the Swedish Financial Supervisory Authority, Folksam, and Swedbank involving ongoing financial fraud and money laundering on an international scale. It involved people and companies in Scotland, the Netherlands, Eastern Europe, Russia and the former states of the Soviet Union, Turkey, and Pakistan, as well as to countries in the Middle East.

231.    On March 22, 2019 Carlström responded to the Swedish Tax Agency's demands by providing very specific answers to the questions posed – with documentary proof supporting each response.

232.    By April 2019, Carlström had traced transactions involving money laundering and financial fraud to companies and people with outstanding international arrest warrants.

233.    In April 2019, Carlström sent Katrin Westling Palm, Swedish Tax Agency's Director-General an email in which Carlström explained in detail the corruption that existed in the Swedish Pension Agency and related private companies, how that corruption had been accomplished, and where in the system billions of dollars had been stolen over the years. He was also able to identify money laundering through different companies he mentioned. A copy of that email was also sent to the two tax investigators, Katarina Hansson Brodd and Ingrid Onsjö, who had harassed and terrorized Carlström and his companies during the previous years.

234.    In the weeks following the email, many Swedish officials, relatives, and close friends in Swedbank, Swedish Tax Agency, the Swedish Pension Authority, and the Swedish Financial Supervisory Authority, resigned as members of boards that Carlström had identified as involved money laundering and financial fraud.

235.    In particular, a person with suspect links to Katarina Hansson Brodd resigned April 15, 2019, five days after being linked to Solidar.

236.    Another company, Dalmagarry Properties LTD, in Scotland, was identified (by Carlström) as the largest owner of Indecap, the company, as detailed ante, at ¶¶ 39-69, involved in stealing billions of dollars from clients of Folksam, Swedbank, and the Swedish Pension Authority.

237.    On April 15, 2019, the Swedish Financial Supervisory Authority denied Boflex's second application for a license. Again, no legitimate reason was given for the denial of the completed application.

238.    On April 22, 2019, Victor Carlström located the majority of the funds flowing from Folksam and Swedbank, together with Swedish Tax Agency, the Swedish Pension Agency, and the Swedish Financial Supervisory Authority. Carlström traced Folksam's illegal funds, totaling more than $100 billion USD (in cash) to a financial company in the former Soviet Union. Carlström was able to obtain the financial records of this company that revealed its financial fraud and money laundering. Those discoveries by Carlström enabled him to understand why Folksam had engaged in the unrelenting effort to silence him and to engage the other above-named defendants in Folksam's corrupt and unlawful scheme.

***The Efforts to Harm, and Thereby Silence, Carlström***

239.    In the evening of April 23, 2019, Carlström's two "burner" telephones purchased in the Netherlands rang simultaneously on two of Carlström's encrypted telephone "apps," Signal and WhatsApp. Additionally, two other "burner" telephones purchased in the UAE,  and both Skype phones, all rang at the same time. The callers' phone numbers were all from Pakistan, Turkey, and/or the UAE.

240.    The callers urged Carlström and his wife to stay on the phone at all times and were talking in code words. Carlström understood that the callers were trying to locate the room in the hotel in which the family was staying. The intent was clear:  to locate and harm – and even kill – Carlström and his family to prevent Carlström from revealing the information he had learned. Calls from those numbers continued even after Carlström and his family were in the United States.

241.    Confronted with that extraordinary and imminent danger, Carlström decided to escape immediately from United Arab Emirates to what he perceived as the safety of New York in the United States.

242.    On April 24, 2019, Carlström and his family arrived on a nonstop flight to New York.

243.    The harm to Carlström's family, and particularly his young children, has been substantial and ongoing, and has weighed heavily on Mr. Carlström and his emotional health. Carlström's four year-old son had become numb after three months in the exceedingly difficult and isolating, constricting situation he had endured in the United Arab Emirates. He did not talk and had completely locked himself in, and was very traumatized. He repeatedly hit himself and repeatedly stated that he wanted to die.

244.    In addition, Carlström's six year-old daughter was severely traumatized and grew aggressive. She, like the entire family, suffered severe depression as a result of the situation.

245.    As a consequence of Defendants' relentless efforts to crush Carlström, his business and his family Carlström met with a Swedish psychiatrist, Kristoffer Södersten, in the UAE.

246.    Dr. Södersten examined Carlström, his young son, and his daughter. They all had experienced severe trauma, particularly the children, who for their safety had essentially been confined to hotel rooms for an eight-week period. The children were very depressed as a result of the situation and what they had endured.

247.    The mental and physical toll on the Carlström family was described in detail in an email to Katrin Westling Palm.

248.    On May 2, 2019, Katrin Westling Palm responded to Carlström's email by announcing that Swedish Tax Agency would start new investigations and go through all

Carlström's companies and their transactions again, despite having already done so several times since October 2017.

249.    Palm appointed five new tax investigators:  Erik Ljungberg, Maria Holmberg, Lena Bergkvist, Ulf Pettersson, and Annika Berg. All are managers from Tax Department 44, the Swedish Tax Agency's most aggressive department. It specializes in organized international crimes and terror organizations, and works together with economic crime police in Sweden and other countries.

250.    Yet to this day the Swedish Tax Agency has not found any wrongdoing by or involving Carlström or his companies – after already investigating all of Carlström's companies for years.

**The Conspiracy to Murder Carlström In the U.S.**

251.    Believing he was finally safe in New York, Carlström learned all too quickly that the defendants' wrath and reach extended across the Atlantic Ocean. On May 3, 2019 at 10:30 a.m., Carlström was inside his hotel room in New York. He watched the handle on the door move down very slowly. The door opened but fortunately, the chain on the door kept it from opening more than a few inches. Carlström rushed to the door and smashed it, using his body weight so it closed. Carlström's daughter started screaming and crying. The intruder then tried twice more – and the third time tried to break down the door. There was full-scale panic at the scene.

252.    Carlström's wife immediately called 911, and hotel security personnel arrived quickly, causing the intruder to flee the scene. The New York City Police Department ("NYPD") also responded to the scene quickly. That incident represented the mental breaking point for Carlström's wife and children. They cried all the time and shook with fear.  NYPD transferred the

case to the Federal Bureau of Investigation ("FBI"), which interviewed Carlström by telephone that day.

253.    Weeks later, Carlström awoke to find that his wife had left New York with their two children and all their baggage. Carlström's wife flew home to her parents in Sweden with plans to file for a divorce from Carlström. She believed it was too dangerous for her and their children to be around Carlström, and that she and the children would be killed if she stayed with him.

254.    At that point, Carlström had lost all of his companies, employees, clients, houses, friends, relatives, home country, and, with their departure, his wife and his two children, too. He decided that suicide was his only opition.

255.    On May 15, 2019 Carlström swallowed a combination of the antidepressant Anafranil along with Xanor and Propavan. Carlström laid down in bed to die. He awoke 26 hours later on the bathroom floor, unable to move.

256.    After regaining some consciousness, Carlström tried to commit suicide a second time. He swallowed as many tablets of Xanor, Propavan, and Anafranil he could handle. He then laid on the bed again to die, and fell asleep.

257.    Carlström was saved only because he had sent a suicide note to his wife. As a result, she contacted the hotel, and security staff rushed to Carlström's room. Carlström was rushed by ambulance to Methodist Hospital in Brooklyn where he lingered between life and death for five days. He remained in the hospital for 16 days before being released.

258.    Because of the unrelenting efforts by Folksam, Swedbank, and the other Defendants to remove Carlström as a threat to their enterprise, Carlström was compelled to change hotels frequently and hire bodyguards to protect himself.

259.    In July 2019, Carlström was staying at a luxury hotel in New York while preparing this lawsuit with his attorney. After a short stay at the hotel, Carlström's bodyguard informed Carlström that he was being following by someone Carlström himself had noticed for two days. Carlström and his bodyguard decided to perform certain conduct to confirm that Carlström was being followed. For example, when Carlström went to a restroom in the hotel lobby, the other person followed him in there. When Carlström sat in a private area, the other person sat across the room from him.

260.    At some point, the person conducting the surveillance of Carlström realized he had been spotted. He left the hotel swiftly, followed by Carlström's bodyguard, who observed the surveilling person approach a car in front of the hotel. Three other persons were in the car. The surveilling person then walked to a car directly ahead of that car, with four persons inside, and chatted with them before returning to the rear car. Carlström's bodyguard recorded the New Jersey license plate numbers of the two cars, which were not identifiable from any data base publicly available.

261.    Carlström's bodyguard recommended that Carlström leave the hotel to ensure his safety. Carlström carried one small bag, leaving his other luggage in the room, and was escorted by the head of hotel security out an employee entrance. Carlström and his bodyguard quickly haled a yellow cab and departed, although Carlström's bodyguard also conducted some counter-surveillance techniques (*i.e.*, stopping the cab and exiting for a moment, and also changing taxis during the trip).

262.    After that incident, Carlström's security team concluded that New York was too dangerous for him, and he moved to a hotel in Los Angeles. However, while sitting by the pool each afternoon, Carlström and his security detail noticed another person at the pool using his phone

either to photograph or videotape Carlström. Another person also appeared to be monitoring Carlström. Review of the hotel's security camera footage showed that one of those persons had sneaked into a restricted area of the hotel.

263.   Carlström's security detail decided to call the Los Angeles Police Department, and after LAPD arrived, subsequently decided to move him again, this time to a hotel adjacent to the Los Angeles International Airport. The following day, a journalist with an appointment to meet Carlström informed him that while he had been waiting outside, he noticed two men watching Carlström's room for 45 minutes. A member of Carlström's security detail observed the two men as well.

264.   A decision was made to leave the hotel promptly. Carlström, a bodyguard, and the journalist hurried through the crowded lobby to board a shuttle van to the airport terminals. The two suspicious men rushed through the lobby after Carlström and hopped aboard the shuttle even though they did not possess any luggage. The journalist confided to Carlström that he thought Carlström was in imminent, and perhaps fatal, danger, and devised a plan whereby he would distract the two men with conversation while Carlström would alert the shuttle van driver and exit the van and summon airport police.

265.   The journalist engaged the two men in conversation while Carlström prevailed upon the driver to make an unscheduled stop. Carlström ran the 50 meters to the terminal and found police personnel. By that time the journalist had also departed the van, and the two other men had disappeared. The police officers interviewed Carlström and the journalist, and then escorted Carlström through the terminal to where Carlström boarded a flight to Las Vegas. Since that episode Carlström has changed hotels on a frequent basis.

*The Intrusion Into Carlström's Computers*

266.     While Carlström was in New York, and after his May 2019 email to Westling Palm, there was intrusion into the email account of one of his Cyprus companies, evidenced by an unauthorized log-in into the company's email system. The origin of the intrusion was traced to Istanbul, Turkey. The cost and losses to Carlström and his companies from the computer hacking – including security measures required to correct the initial problem caused by the intrusion, and to guarantee secure communications and the confidentiality of business and personal information going forward – exceeded $5,000 USD.

*Jens Henriksson Takes the Helm at Swedbank*

267.     On August 29, 2019, the Director-General for Folksam, Jens Henriksson, was announced as the new Director General for Swedbank.

268.     On September 16, 2019, Henriksson began to "clean house" at Swedbank. He fired most, if not all of the key people on Swedbank's election committee and in many other key positions in the bank. Henriksson had done the same at Folksam in 2013 when he had been appointed Folksam's Director-General.

269.     The new people appointed by Henriksson at Swedbank are the very people who, during the prior four years, had utilized their position of power in various government agencies to assist Henriksson in crushing Carlström in order to continue to conceal their corrupt and unlawful endeavor (and their prodigious scope).

270.     In particular, Henriksson brought to Swedbank his close friend, Charlotte Rydin, the former head of legal at the Swedish Financial Supervisory Authority. It was Rydin who worked forcefully to deny Boflex permission to distribute mortgages in Sweden.

271.    Another person Henriksson placed at Swedbank was his close friend Ylva Wessén, Folksam's new Director-General, who assumed a position as a member of a Swedbank Board committee. While at Folksam, Wessén was one of the primary people responsible for the attacks against Carlström and his companies.

272.    On October 8, 2019, Carlström and his lawyer met with officials of the United States Attorney's Office for the Sothern District of New York, including an FBI official.

## JURY TRIAL DEMAND

273.    Pursuant to Rule 38, Fed.R.Civ.P., Plaintiffs demand trial by jury in this action for all issues so triable.

## FIRST CAUSE OF ACTION
## (ALL PLAINTIFFS AGAINST ALL DEFENDANTS)
## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
## (RICO VIOLATION OF 18 U.S.C. §1962(c)

274.    Plaintiffs re-allege and re-incorporate herein by reference the allegations previously set forth herein.

### *The Substantive RICO Violation*

275.    Defendants are all "persons" within the meaning of 18 U.S.C. §1961(3). At all relevant times, Defendants conducted and/or participated in the affairs of the Racketeering Enterprise, identified **post**, at ¶¶ 277-79, which affected interstate and foreign commerce, through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c), including acts indictable under the statutes listed **post**, at ¶ 281-84.

276.    As described above, each Defendant participated in the operation or management of the Racketeering Enterprise, and benefitted financially from their position in and/or the activities of the Racketeering Enterprise.

*The Racketeering Enterprise*

277.    Beginning from at least in or about 2015 and continuing through the filing of the this Complaint, Defendants, along with others known and unknown, formed an association-in-fact Racketeering Enterprise as that term is defined in 18 U.S.C. §1961(4). The Racketeering Enterprise was an organized criminal group that operated in the Southern District of New York and elsewhere. As demonstrated by its members' ongoing coordination, communication, and efforts to work together, the Racketeering Enterprise constituted an ongoing organization in which its members functioned as a continuing unit for a common purpose of achieving the objectives of the Racketeering Enterprise.

278.    From the date the Racketeering Enterprise was formed until the present, its members and others acting at their direction have worked together to further their mutual goal of using illegal means to achieve the purposes of the Racketeering Enterprise, which included the following:

    a.   Destroying Carlström, even to the extent of conspiring to kill him;

    b.   Destroying Carlström's companies (the other Plaintiffs), including those in which Plaintiff Brune was involved;

    c.   Enriching its members and others through fraud and other illegal activities;

    d.   Avoiding detection by law enforcement authorities and other regulatory agencies, and/or by Defendants' clients and/or employers.

279.    In addition to Defendants, other members and associates of the Racketeering Enterprise include, among others known and unknown, MAGNUS BJÖRKMAN, YLVA WESSEN, MATZ GLENHAGE, STEFAN HOLM, LENA HÖGFELT, ANNA-KARIN LAURELL, CARINA ELM, LENNART MOLIN, JOHAN KARLSSON, MATZ GLENHAGE,

HAMADI SAIDI, ALF SADE, MALIN HLAWATSCH, CHARLOTTE RYDIN, ANNA CEDERBERG, KATARINA HANSSON BROOD, INGRID ONSJÖ, ERIK LJUNGBERG, LENA BERGKVIST, MARIA HOLMBERG, ULF PETERSSON, ANNIKA BERG, and ANNA KARIN HÄLL.

### Means and Methods of the Enterprise

280.    Among the means and methods by which the Defendants and other Racketeering Enterprise members and associates conducted and participated in the conduct of the affairs of the Racketeering Enterprise were the following:

    a.   Wire and Mail Fraud. Defendants, and others known and unknown, including other members of the Racketeering Enterprise, committed, caused to be committed, attempted to commit, and conspired to commit, acts of mail and wire fraud in connection with the schemes to destroy Carlström and his companies, and injure Brune in his money or property;

    b.   Conspiracy to Murder. Defendants, and others known and unknown, including other members of the Racketeering Enterprise, in consideration for the receipt of, and as consideration for a promise and agreement to pay, a thing of pecuniary value, and for the purpose of gaining entrance to and maintaining and increasing position in the Racketeering Enterprise, knowingly conspired to murder Victor Carlström;

    c.   Travel Act Violations. Defendants, and others known and unknown, including other members of the Racketeering Enterprise, traveled internationally in furtherance of their scheme(s) to defraud Plaintiffs of their money and/or property;

d.  Money Laundering. Defendants, and others known and unknown, including other members of the Racketeering Enterprise, engaged in a series of financial transactions involving the proceeds of specified unlawful acivity, and which were designed to further the unlawful activities of the Racketeering Enterprise, and to promote the specified unlawful activity and/or disguise the proceeds of the Racketeering Enterprise's unlawful activities;

e.  Hobbs Act Extortion. Defendants, and others known and unknown, including other members of the Racketeering Enterprise, committed various acts of extortion by, in part, intimidating and threatening physical or economic harm to individuals in connection with loan collections and in order to obtain money, property, and employment opportunities.

***The Predicate Acts of Racketeering***

281.  Defendants' actions in conducting the Racketeering Enterprise, including their deliberate, malicious, and unrelenting pursuit of Carlström to destroy him and his companies, and their theft and fraud of Plaintiffs' money and property, constitutes a pattern of racketeering as that term is defined in 18 U.S.C. §1961(5).

282.  The actions of all defendants have included multiple, related acts in violation of the following provisions of the United States Code:

a.  <u>Mail Fraud</u> (18 U.S.C. § 1341):  On or about the dates indicated throughout this Complaint, Defendants and/or their employees and/or agents acting on their behalf, aided and abetted by each other, used the United States mails and/or private or commercial interstate carriers in furtherance of a scheme to defraud

Plaintiffs of their money and property in violation of 18 U.S.C. §1341, and 18 U.S.C. §2 as described throughout this Complaint.

b. <u>Wire Fraud</u> (18 U.S.C. § 1343):  On or about the dates indicated throughout this Complaint, Defendants and their employees and/or agents acting on their behalf, aided and abetted by each other, used interstate wires in furtherance of a scheme to defraud Plaintiffs of their money and property in violation of 18 U.S.C. §1343, and 18 U.S.C. §2 as described throughout this Complaint.

c. <u>Conspiracy and Attempt</u> (18 U.S.C. §1349): conspiracy and attempt(s) to commit the acts of Mail and Wire Fraud described above in subsections (a) and (b) of this paragraph, pursuant to 18 U.S.C. §1349;

d. <u>Conspiracy to Murder</u> (18 U.S.C. §1959(a)): From in or about May 2019 through the date of the filing of this Complaint, in the Southern District of New York and elsewhere, Defendants and others known and unknown, in consideration for the receipt of, and as consideration for a promise and agreement to pay, a thing of pecuniary value, and for the purpose of gaining entrance to and maintaining and increasing position in the Racketeering Enterprise, knowingly conspired to murder Victor Carlström, in violation of New York Penal Law, §§125.25 and 105.15, as described throughout this Complaint;

e. <u>Travel Act</u> (18 U.S.C. § 1952):  On or about the dates indicated throughout this Complaint, Defendants and their employees and/or agents acting on their behalf, aided and abetted by each other, traveled internationally in furtherance of a scheme to defraud Plaintiffs of their money and property in violation of 18

U.S.C. §§1341, 1343 and 1349, and 18 U.S.C. §2 as described throughout this Complaint.

f.   <u>Money Laundering</u> (18 U.S.C. §§1956(a)(1)(A)(i) and (B)(i) & 1956(a)(2)(A) and (B)(i) & §1956(h))): On or about the dates indicated throughout this Complaint, Defendants and their employees and/or agents acting on their behalf, aided and abetted by each other, in an offense involving interstate and/or foreign commerce, (1) knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducted or attempted to conduct or conspired to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity with the intent to promote the carrying on of specified unlawful activity; and/or (2) did knowingly transport, transmit, and transfer, and attempt and/or conspire to transport, transmit, and transfer, monetary instruments and/or funds to places in the United States from and through places outside the United States, or to a place in the United States from or through a place outside the United States (A) with the intent to promote the carrying on of specified unlawful activity; or (B) knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity as described elsewhere in this paragraph and Complaint;

g. <u>Money Laundering</u> (18 U.S.C. §1957(a)): On or about the dates indicated throughout this Complaint, Defendants and their employees and/or agents acting on their behalf, aided and abetted by each other, in an offense involving interstate and/or foreign commerce, knowingly engaged or attempted or conspired to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and was derived from specified unlawful activity as described elsewhere in this paragraph and Complaint;

h. <u>Hobbs Act</u> (18 U.S.C. § 1951):  On or about the dates indicated throughout this Complaint, Defendants and their employees and/or agents acting on their behalf, aided and abetted by each other, traveled and took other actions in furtherance of a scheme to extort and rob Plaintiffs of their money and property in violation of 18 U.S.C. §§1341, 1343, 1349, 1951, and 18 U.S.C. §2 as described throughout this paragraph and this Complaint.

283.    The predicate acts of racketeering were related because they all served the purposes of the Racketeering Enterprise, and were committed by Defendants and other members and associates of the Racketeering Enterprise to further its goals.

***Plaintiffs' Injury to Their Business and/or Property***

284.    Plaintiffs have each been injured in their business and property by Defendants' violation of 18 U.S.C. § 1962(c), including injury by reason the predicate acts (*see* ¶¶ 281-83 above) constituting the pattern of racketeering activity.

285.    As a result of Defendants' wrongful conduct in participating in the affairs of a racketeering enterprise Plaintiffs have suffered substantial damage in an amount not less than Four

Billion Two Hundred Seventy-Nine Million, Eight Hundred Thousand dollars ($4,279,800,000.00 USD) dollars.

286.     Pursuant to 18 U.S.C. §1964(c), Plaintiffs are entitled to recover treble damages for both their general and special compensatory damages, plus interest, costs and attorney's fees incurred by reason of Defendants' violation of 18 U.S.C. §1962(c).

**WHEREFORE**, Plaintiffs demand judgment against each of the Defendants, jointly and severally, to recover treble damages for its general and special compensatory damages, plus interest, costs and attorney's fees, by reason of defendants' violations of 18 U.S.C. §1962(d).

**SECOND CAUSE OF ACTION**
**(ALL PLAINTIFFS AGAINST ALL DEFENDANTS)**
**RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT**
**(RICO CONSPIRACY IN VIOLATION OF §1962(d))**

287.     Plaintiffs re-allege and re-incorporate herein by reference the allegations previously set forth herein.

288.     Beginning on or about 2015, and continuing through the time of filing in this Complaint, in the Southern District of New York and elsewhere, Defendants, and others known and unknown, being persons employed by and/or associated with the Racketeering Enterprise described above in ¶¶ 277-79, which Racketeering Enterprise was engaged in, and the activities of which affected, interstate and foreign commerce, knowingly combined, conspired, confederated, and agreed together and with each other to violate 18 U.S.C. 1962(c), to wit, to conduct and participate, directly and indirectly, in the conduct of the affairs of that enterprise through a pattern of racketeering activity, as that term is defined in 18 U.S.C. §§1961(1) and 1961(5), consisting of the multiple indictable predicate acts of racketeering in violation of law listed ante, at ¶¶ 281-83.

289.    It was a part and object of the conspiracy that each Defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the Racketeering Enterprise.

290.    Defendants' conspiracy to violate 18 U.S.C. §1962(c) violated §1962(d).

291.    It was part of the conspiracy that Defendants and their co-conspirators would commit numerous predicate acts of racketeering activity in the conduct of the affairs of the Racketeering Enterprise, including but not limited to, the predicate acts of racketeering enumerated **ante**, in ¶¶ 281-83.

292.    Plaintiffs have been injured in their business or property by Defendants' violation of 18 U.S.C. §1962(d), including injury by reason of the predicate acts constituting the pattern of racketeering activity.

293.    As a result of the conspiracy between and among all of Defendants to violate 18 U.S.C. §§1962(c) and (d), Plaintiffs have suffered substantial damage in an amount not less than Four Billion Two Hundred Seventy-Nine Million, Eight Hundred Thousand dollars ($4,279,800,000.00 USD) dollars.

294.    Pursuant to 18 U.S.C. §1964(c), Plaintiffs are entitled to recover treble damages for both its general and special compensatory damages, plus interest, costs, and attorney's fees, by reason of Defendants' violations of 18 U.S.C. §1962(d).

**WHEREFORE**, Plaintiffs demand judgment against each of the Defendants, jointly and severally, to recover treble damages for their general and special compensatory damages, plus interest, costs, and attorney's fees.

**THIRD CAUSE OF ACTION**
**(BY CARLSTRÖM AGAINST ALL DEFENDANTS)**
**(COMPUTER FRAUD AND ABUSE ACT)**

295.   Plaintiffs re-allege and re-incorporate herein by reference the allegations previously set forth herein.

296.   Carlström's computers are involved in interstate and foreign commerce, and communication, and are protected computers under 18 U.S.C. §1030(e)(2).

297.   Upon information and belief, Defendants knowingly and intentionally accessed Carlström's computers, and/or conspired to do so, and/or attempted to do so, and aided and abetted each other, without authorization or in excess of authorization, and thereby obtained and used valuable information from those computers in violation of 18 U.S.C. §1030(a)(2)(C). Such information included, but was not limited to Carlström's and other Plaintiffs' email correspondence, confidential business information, his contacts, and other confidential personal information;

298.   Upon information and belief, Defendants intentionally accessed, attempted to access, and/or conspired to access, a protected computer or computers without authorization, and as a result of such conduct, caused damage and loss, in violation of 18 U.S.C. §1030(a)(5)(C), or recklessly caused damage, in violation of 18 U.S.C. §1030(a)(5)(B).

299.   Defendants caused loss to one or more persons during a one-year period aggregating well over $5,000 in value;

**WHEREFORE**, Carlström suffered damage and loss as a consequence of Defendants' actions, including but not limited to the cost of investigating and responding to the unauthorized access and abuse of their computer networks, conducting damage assessments, restoring and replacing computers and data, programs, systems, or information, installing security measures to

prevent further intrusions, and the harm to Plaintiffs' business(es) as described above. Plaintiffs seek compensatory and other equitable relief under 18 U.S.C. §1030(g).

## FOURTH CAUSE OF ACTION
### (BY RESURS DIREKT AGAINST FOLKSAM)
### (BREACH OF CONTRACT)

300.    Plaintiffs re-allege and re-incorporate herein by reference the allegations previously set forth herein.

301.    In or about 2013 Plaintiff Resurs Direkt and defendant Folksam entered into a contract by which Folksam agreed to pay to Resurs Direkt brokerage commissions.

302.    The Agreement was duly signed and executed Resurs Direkt and Folksam.

303.    The terms of that Agreement obligated defendant Folksam to pay to Resurs Direkt all brokerage fees due and owing to the company as consideration for Resurs Direkt's placement of its clients' funds with Folksam.

304.    Following execution of the Agreement in 2013 defendants paid to Resurs Direkt the brokerage fees it was due. However, beginning in September 2015, Folksam refused to pay any fees due pursuant to the contract, determining unilaterally that the contract between Folksam and Resurs Direkt was a nullity.

305.    Defendant Folksam breached the contract between the parties without legal right, cause, or justification.

306.    The contract provides that in the event Folksam cancelled the contract, it would pay Plaintiff Resurs Direkt all deposited commissions in advance in one payment. That commission was at the time $12,000,000.00 USD.

307.     Over the course of the following year(s), through the filing of this Complaint, Plaintiff Resurs Direkt has continued to demand its payment per the terms of the Agreement. defendant Folksam has refused to make any payment.

**WHEREFORE**, plaintiff Resurs Direkt demands judgment against defendant Folksam for damages of at least Twelve Million $12,000,000.00 USD) dollars for plaintiff Resurs Direkt's direct out-of-pocket losses resulting from defendant Folksam's breach of contract, an award of attorney's fees consistent with the terms of the Agreement between the parties and for such other and further relief this Honorable Court deems just and proper.

### FIFTH CAUSE OF ACTION
### (BY VINACOSSA, RESURS DIREKT, SPARFLEX, BOFLEX AGAINST FOLKSAM, SWEDBANK, HENRIKSSON, THEDÉEN, and WESTLING PALM) (TORTIOUS INTERFERENCE WITH CONTRACT)

308.     Plaintiffs re-allege and re-incorporate herein by reference the allegations previously set forth herein.

309.     Valid contracts existed between Plaintiffs Vinacossa, Resurs Direkt, Sparflex, Boflex and third-party Nord, and subsequently with third-party Exceed

310.     Defendants were aware of Plaintiffs Vinacossa, Resurs Direkt, Sparflex, Boflex contracts with Nord and Exceed.

311.     Defendants intentionally and without justification procured Nord's and Exceed's breach of their contracts with Plaintiffs Vinacossa, Resurs Direkt, Sparflex, Boflex.

312.     As a direct and proximate cause of Defendants' conduct, Plaintiffs Vinacossa, Resurs Direkt, Sparflex, Boflex suffered damages in the amount of $4,279,800,000.00 USD.

**WHEREFORE**, Plaintiffs Vinacossa, Resurs Direkt, Sparflex, Boflex demand judgment against defendants Folksam, Henriksson, Thedéen, and Westling Palm, jointly and severally, for

damages of at least $4,279,800,000.00 USD dollars for Plaintiffs Vinacossa, Resurs Direkt, Sparflex, Boflex and their direct out-of-pocket losses resulting from Defendants' tortious conduct, and for such other and further relief this Honorable Court deems just and proper.

**SIXTH CAUSE OF ACTION**
**(BY VINACOSSA, RESURS DIREKT, BOFLEX, and SPARFLEX, AGAINST FOLKSAM, SWEDBANK, HENRIKSSON, THEDÉEN, and WESTLING PALM) (TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE)**

313.    Plaintiffs re-allege and re-incorporate herein by reference the allegations previously set forth herein.

314.    Plaintiffs Carlström, Vinacossa, Resurs Direkt, Sparflex, had business relations with Nord and Exceed. Also, Boflex had a prospective relationship with Swedbank for the purpose of distributing mortgages.

315.    Defendants interfered with those business relations.

316.    Defendants' interference with those business relations was for the sole purpose of harming Plaintiffs Vinacossa, Resurs Direkt, Sparflex, and Boflex, and/or used wrongful means independent of the interference caused thereby.

317.    As a direct and/or proximate cause of Defendants' interference, Plaintiffs Vinacossa, Resurs Direkt, Sparflex, and Boflex's business relationship(s) with Nord and Exceed were injured.

318.    As a direct and/or proximate cause of Defendants' interference, Plaintiffs Vinacossa, Resurs Direkt, Sparflex, and Boflex suffered damages.

**WHEREFORE**, Plaintiffs Vinacossa, Resurs Direkt, Sparflex, demand judgment against defendants Folksam, Henriksson, Thedéen, and Westling Palm, jointly and severally, for damages of at least Four Billion Two Hundred Seventy-Nine Million, Eight Hundred Thousand dollars ($4,279,800,000.00 USD) dollars for Plaintiffs Vinacossa, Resurs Direkt, Boflex, and Sparflex's

direct out-of-pocket losses resulting from Defendants' tortious conduct, and for such other and further relief this Honorable Court deems just and proper.

## SEVENTH CAUSE OF ACTION
## (BY CARLSTRÖM AGAINST ALL DEFENDANTS)
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

319.    Plaintiffs re-allege and re-incorporate herein by reference the allegations previously set forth herein.

320.    Defendants committed extreme and outrageous conduct against Carlström, his wife, and minor children.

321.    Defendants intended to cause, and did cause, Carlström severe emotional distress.

322.    Defendants' extreme and outrageous conduct against Carlström, his wife, and minor children was committed in disregard of a substantial likelihood of causing Carlström severe emotional distress.

323.    Defendants' extreme and outrageous conduct against Carlström, his wife, and minor children was the direct and proximate cause of Carlström's severe emotional distress.

324.    As a result of Defendants' extreme and outrageous conduct against Carlström, his wife, and minor children, Carlström has suffered, continues to suffer, and will continue to suffer, severe emotional distress.

**WHEREFORE**, Plaintiff Carlström demands judgment against Defendants, jointly and severally, for Carlström's injury and losses resulting from Defendants' tortious conduct to be determined by the finders of fact, and for such other and further relief this Honorable Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants on all Causes of Action, and seeks such relief as set forth above for each Cause of Action, and as specified below for all Causes of Action for which such relief is provided by law:

(a)      Awarding Plaintiff all costs and attorneys' fees to the full extent permitted under the applicable law;

(b)      Awarding Plaintiff pre- and post-judgment interest as permitted by law; and

(c)      Awarding any other relief as the Court may deem just and proper.

Dated:      New York, New York
December 17, 2019,

                         __/S/Lawrence H. Schoenbach_____
                         Lawrence H. Schoenbach, Esq.
                         Law Offices of Lawrence H. Schoenbach
                         111 Broadway, Suite 901
                         New York, New York 10006
                         *Attorney for Plaintiff*

                         Joshua L. Dratel
                         Dratel & Lewis, P.C.
                         29 Broadway, Suite 1412
                         New York, New York 10006
                         (212) 732-0707
                         jdratel@dratellewis.com
                         *Attorneys for Plaintiff*

## VERIFICATION

I, Victor Carlström, declare as follows:

    1. I am a Plaintiff in the present case and a citizen of Sweden. I am currently residing in the United States and have reviewed the foregoing *Verified Complaint*.

    2. I have personal knowledge of myself, my activities, and my intentions, including those set out in the foregoing *Verified Complaint*, and if called on to testify I would competently testify as to those matters stated herein.

    3. I have personal knowledge of my companies Vinacossa Enterprises AB, SBS Resurs Direkt AB, Boflexibilitet Sverige AB, Vinacossa Enterprises Ltd., and Sparflex AB, their activities and intentions, including those set out in the foregoing *Verified Complaint*, and if called on to testify I would competently testify as to the matters stated herein. On all other matters in the foregoing *Verified Complaint*, I verify that they are based upon my information and belief.

    4. I verify under penalty of perjury under the laws of the United States of America that the factual statements in this Complaint concerning myself, my activities, and my intentions are true and correct, as are the factual statements concerning Vinacossa Enterprises AB, SBS Resurs Direkt AB, Boflexibilitet Sverige AB, Vinacossa Enterprises Ltd., and Sparflex AB, and their activities and intentions. 28 U.S.C. §1746.

Executed December 17, 2019.

Victor Carlström

## CERTIFICATE OF SERVICE

I hereby certify that on December 17, 2019, I electronically filed the Verified Complaint with the Clerk of the Court using ECF, who in turn sent notice to all counsel of record.


Dated: December 17, 2019                    ___/s/ Joshua L. Dratel_____
                                            Joshua L. Dratel